# DECLARATION OF MR. MICHEL BARBEY

1.     My name is Michel Barbey.  I am the Chairman of SVM Holding S.A., a company duly organized and existing under the laws of Luxembourg, with its Registration No. B 125500, having its registered address at 151, AVENUE DE LA FAIENCERIE, L-1511 LUXEMBOURG (hereinafter referred to as "**SVM**").  I am fully familiar with the facts and circumstances of the dispute between SVM, on one part, and Nexus Maritime Services GMBH (hereinafter referred to as "**Nexus**") and Mr. Vladimir Shumilin (hereinafter referred to as "**Mr. Shumilin**"), the arbitration between the parties, and all of the proceedings between the parties to date.  I am fully authorized to make this Declaration on behalf of SVM in support of its application for a temporary restraining order and/or any other injunctive relief against Nexus and the Palau International Ship Registry (hereinafter referred to as "**Palau Registry**").

2.     The contents of this Declaration are within my own knowledge and are true and correct.

3.     On or about May 16, 2014, SVM and Nexus executed and entered into a Loan Agreement and Addendum 1 thereto wherein SVM agreed to loan Nexus the sum of Twelve Million Three Hundred Thousand US dollars (US$12,300,000) (hereinafter collectively referred to as "**the Loan**"), with repayment by Nexus being due in one year.  A true and correct copy of the Loan Agreement is attached hereto as Exhibit 1.

4.     Although Nexus' intended use for the Loan is not described in the Loan Agreement, Nexus represented to SVM that the sole purpose of the Loan was to purchase two vessels, the M/V "SOY-1" (Lloyds Register/+100A1, Roll on – Roll of Cargo/Passenger Ship, Ice Class 3, UMS, +LMC, Call Sign: TCFQ, Grt/Nrt: 13867/4160, Register number: TUGS 06) and the M/V "SOY-2" (Lloyds Register/+100A1, Roll on – Roll of Cargo/Passenger Ship, Ice Class 3, UMS, +LMC, Call Sign: TCFW, Grt/Nrt: 13867/4160, Register number: TUGS 07) (hereinafter collectively referred to as "**the Vessels**").  Thus, Nexus represented to SVM that on May 15, 2014, Nexus entered into two (2) Memoranda of Understanding with SUMARINE DENIZCILIK A.S. of Istanbul, Turkey (hereinafter referred to as the "**Seller**"), whereby Nexus agreed to purchase from the Seller, and the Seller agreed to sell to Nexus, the Vessels in exchange for a total purchase price of Eleven Million Nine Hundred Thousand US dollars (US$11,900,000).  Nexus provided SVM with two (2) copies of the Memoranda of Understanding executed by and between Nexus and the Seller, which appear as Exhibit 2 and Exhibit 3, accordingly.  Nexus informed SVM that according to the Memoranda of Understanding, no later than May 18, 2014, Nexus was obligated to pay the Seller a deposit for the Vessels in the total amount of One Million Eighty Thousand US dollars and that Nexus was in urgent need of funds to secure the purchase of the Vessels and complete the acquisition thereof.

5.     SVM and Nexus quickly made a deal whereby SVM agreed to finance the purchase of the Vessels by Nexus and pay for miscellaneous purchase related costs and expenses, such as the Vessels' fuel, registration fees, etc.  Immediately upon the receipt of the Loan, Nexus purchased the Vessels.  As confirmation of completing the purchase, Nexus provided SVM with two (2) Bills of Sale executed on June 3, 2014 by and between Nexus and the Sellers, which appear as Exhibit 4  and Exhibit 5, accordingly.  Nexus also provided SVM with a copy of the Irrevocable Transfer Order dated May 21, 2014 to confirm the transfer of the purchase price for the Vessels



to the Sellers. A copy of the said Irrevocable Transfer Order appears as <u>Exhibit 6</u> attached hereto.

6.    Nexus failed to repay the Loan in accordance with the terms of the Loan Agreement. Accordingly, Nexus is in breach of the Loan Agreement, and Nexus has offered no justification or defense for its failure to comply with its contractual obligations. In addition, SVM discovered that shortly after the purchase Nexus re-named the Vessels (the new names of the Vessels are "NOVOROSSIYSK" and "SEVASTOPOL") and changed their place of registration from Turkey to the Republic of Palau.

7.    Pursuant to the terms of the Loan Agreement, SVM commenced a Swiss arbitration proceeding against Nexus in order to recover the Loan.

8.    The Vessels are the only known assets of Nexus. Accordingly, should Nexus transfer or otherwise encumber the Vessels during the pendency of the arbitration, SVM faces the serious and imminent threat that, upon completion of the arbitration, it may have an uncollectable award for the unpaid and outstanding Loan.

9.    In order to protect SVM's interests, and to ensure that the Vessels will be recoverable or otherwise subject to execution upon completion of the arbitration proceeding, SVM applied for emergency relief in the Swiss arbitration proceeding. Specifically, SVM requested that the arbitrator enter an order preventing Nexus from transferring, granting pledges or other security interests, or taking any other action that would affect the ownership rights and interests regarding the Vessels.

10.    SVM is also pursuing criminal options available to it, and the Russian authorities have recently opened an investigation in this matter. A true and correct (translated) copy of the criminal complaint is attached hereto as <u>Exhibit 7</u>. SVM requested to open the criminal investigation in Russia because at the time of negotiating and signing of the Loan Agreement Nexus's principal management team (Mr. Vladimir Shumilin and Mr. Valerii Revunkov) were citizens of the Russian Federation and were residing in Russia. A copy of the General Power of Attorney for Mr. Valerii Revunkov to act on Nexus' behalf appears as <u>Exhibit 8</u> hereto. A copy of the Minutes of the Resolutions of the Sole Director of Nexus adopted on June 2, 2014 confirming that all of the capital stock of Nexus is owned by Mr. Vladimir Shumilin appears as <u>Exhibit 9</u> attached hereto.

11.    On August 19, 2015, the Swiss arbitrator signed and entered Procedural Order No. 1, which included a Preliminary Order on Application for Emergency Relief (hereinafter referred to as **"the Preliminary Order"**). A true and correct copy of the Preliminary Order is attached hereto as <u>Exhibit 10</u>.

12.    Pursuant to the Preliminary Order, the arbitrator ordered Nexus "not to dispose in any way (e.g. by a transfer of ownership, granting of a pledge or other security interests, or by any other act materially affecting its ownership rights and interests) of the Vessels."

13.    Both prior to the commencement of the arbitration proceeding and thereafter, Nexus has failed to respond to SVM's repeated requests for payments and/or an accounting of the funds provided through the Loan.  Additionally, at the time of the Preliminary Order and up to the date of this Declaration, Nexus had not made an appearance in the arbitration proceeding.

14.    Following the issuance of the Preliminary Order, SVM took additional steps to ensure that the only known assets of Nexus (i.e., the Vessels) would be protected from transfer or encumbrance during the pendency of the arbitration proceeding.  One of the steps taken by SVM was to notify the Palau Registry of the Preliminary Order and the injunctive relief granted therein.  A true and correct copy of SVM's notice to the Palau Registry is attached hereto as Exhibit 11.

15.    As the official registry for the Vessels, the Palau Registry is vested with the authority to record the transfer of ownership of the Vessels as well as any mortgages or other encumbrances placed upon the title of the vessels.

16.    The Palau Registry is not a party to the arbitration and the arbitrator has no authority or jurisdiction to compel the Palau Registry to comply with the Preliminary Order.

17.    In view of the above items, and in light of the likelihood that SVM will prevail in the pending arbitration, it is probable and imminent that Nexus will attempt to transfer or otherwise encumber its only known, recoverable assets (i.e., the Vessels), and, if Nexus is successful in doing so, SVM will be left with an irreparable injury for which there is no adequate remedy at law (i.e., an uncollectable award).  Moreover, as the Swiss arbitrator indicated in the Preliminary Order that it has no authority and/or jurisdiction over the Palau Registry, and the Palau Registry responded to SVM's notice regarding the Preliminary Order that it is not bound by the Order, SVM is reasonably concerned that the Palau Registry may be complicit in any attempt by Nexus to delete the Vessels from the Palau Registry and/or to transfer or otherwise encumber title to the Vessels.

18.    Based on the foregoing, SVM has a legitimate concern that an arbitration award would be rendered ineffectual absent the injunctive relief sought pursuant to SVM's application for a temporary restraining order and/or other injunctive relief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing (attached) is true and correct.

Executed in Geneva, Switzerland on the September 1, 2015.

Michel Barbey

3

# LOAN AGREEMENT

3. GenevaMay 16th ,2014

4. **NEXUS MARITIME SERVICES Gmbh**, having its registered office in Greece 36. Amfiktionion Str.15236 Nea Penteli, Athens, Greece, Post address: 26, Anoixeos str. 14568 Krioneri, Attica, Greece in the person of Director Christoforos Kontraros ,hereinafter referred to as the "Borrower" on one hand and

5. **SVM Holdings SA**,registered at 55 Avenue de la Liberte, L-1931 Luxembourg, Reg. No B 125500, hereinafter referred to as the "Lender", in the person of Director Michel Barbey, on the other hand (together the "Parties" or individually the "Party") have agreed on the following:

1. **Preamble**

6. **Whereas**:

7. The Borrower requests funds, and the Lender is ready to provide funds to the Borrower on the terms of priority and recurrence. The Parties have entered in to this Loan Agreement hereinafter referred to as the «Agreement», on the following terms:

2. **Article 1. Subject and main terms of the Agreement** :

8. 1.1. The Lender shall provide to the Borrower the loan in the amount of 11 000 000 (eleven million) USD, hereinafter referred to as "The Loan", with the term of 1 year(one year) on the terms and in order established by the present Loan Agreement.

9. 1.2. The Borrower shall irrevocably and unconditionally be liable to return the Loan to the Lender not later than in 1 year (one year)from the day of the Loan value cash letter to the "Lender's"bank account and to pay the interest rate established by the Loan Agreement.

10. **Article 2. Terms of lending and redemption of the Loan**

11. 2.1. The Lender shall transfer the Loan amount to the Borrower within 3 (three) days after the signing of the Loan Agreement.

12. 2.2. The day of Loan shall be the day of the Loan value cash letter to the Borrower's bank account hereinafter referred to as the "Date of Loan".

13. 2.3. Return of the Loan by the Borrower, hereinafter referred to as a "Main Debt"in the amount and in the currency specified in parag.1.1 of Article 1 of the Loan Agreement, shall be performed by the Borrower at time and in the full volume not later than in 1 year (one) from the date of the loan value cash letter to the Borrower's bank account (the "Date of loan") or earlier according to the parties agreement.

14. 2.4. The rate of interest for using the Loan represents 5 % (five percent) annually.

15. 2.5.Payment by the Borrower of interest for using the loan is done at the same time as refund of the Main Debt.

16. 2.6.Lender has a right to request an earlier reimbursement of the Main debt. In a case if the above Lender's request about prescheduled refund of the Main debt is sent to the Borrower within6 (six) months since the Loan was given, no interest for the Main loan is charged either paid.

17. 2.7. In case if the requirement about prescheduled refund of the Main debt is sent to the Borrower in time exceeding 6 (six) months from the date of loan, interest for using the Loan

1

**EXHIBIT** 1

is charged and paid at a rate of 50 % from the rate specified in parag. 2.4 of Article 2 of the present Agreement during the time Borrower uses loaned funds.

18. 2.8. The day of cessation of the Borrower's liabilities as to the Lender on the Loan return hereinafter referred to as "Date of redemption" shall be the day of funds cash letter to the Lender's bank account in the sum covering the total amount of the Loan.

3. **Article 3. Responsibility of the parties**

19. 3.1. In case of untimely or incomplete payment of the Main debt, since the first date of the delay and before date of the payment of Loan totality the Borrower has to pay the penalty to the Lender for using the Loan at the rate of 0,05 % (zero point five hundredth) charged on the outstanding sum of the loan.

20. **Article 4. Force-majeure events**

21. 4.1. The Parties shall be released from liability for non-performance and/or undue performance was the consequence of force-majeure events defined in accordance with the applicable rule of law and requirements of the legislation existing or arising after the conclusion of the present agreement and directly affecting obligation performance under the present Agreement. In the case of force-majeure events performance of the obligations by the Parties under the present Agreement shall be suspended for the period of this event effect.

22. **Article 5. Applicable law and order of dispute solution**

23. 5.1. The present Agreement and another legal relationship of the Parties resulting from it shall be regulated by the law of the Switzerland and shall be subject to interpretation in accordance to it.

24. 5.2. Any dispute, controversy or claim arising out of or in relation to this Agreement, including the validity, invalidity, breach or termination thereof, shall be settled by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these Rules. The number of arbitrators shall be one. The seat of the arbitration shall be in Geneva. The arbitral proceedings shall be conducted in English.

25. **Article 6. Other conditions**

26. 6.1. The present Agreement shall come into effect from the date of the Loan value cash letter to the Borrower's bank account and will be valid until the all obligations under the present Agreement have performed by the Parties.

27. **Article 7. Requisites and signatures of the parties**

28. The agreement shall be signed on 16, May 2014 in two original of 3 (three) pages: one for each Party, in English.

Addresses and requisites of the Parties

**BORROWER:**
NEXUS MARITIME SERVICES Gmbh
Registered office: in Greece
36, Amfiktionion Str.
15236 Nea Penteli
Athens,
Greece
Post address

26, Anoixeos str.
14568 Krioneri
Attica
Greece

BANK :

PIRAEUS BANK ( Piraeus branch)
S.W.I.F.T. / BIC PIRBGRAAXXX

IBAN : GR 06 0171 5520 0065 5210 8772 012

BENEFICIARY : NEXUS MARITIME SERVICES Gmbh
The registered agent in Liberia : LISCR Trust Company
Monrovia, Liberia
29., 80 Broad Street

LENDER:
SVM Holding SA
55 Avenue de la Liverte
L-1931 Luxembourg

BANK:
For payments in USD
Ne de depot titres 10.181243. 3
IBAN / n° de compte :
CH77 0876 5101 8124 3300 1 (USD)

Bank details:
Adress:
Notenstein Banque Privee SA
Bold 17 9004 St-Gall Suisse
BIC (SWIFT) WEGECH2G
Ne de clearing 8765
Corresponding bank
USD Deutsche Bank Trust, BIC (SWIFT):
BKTRUS33
AEUR SECB Swiss Euro Clearing Bank,
BIC (SWIFT): SECGDEFF

Signatures of the Parties

Signature:                    Michel Barbey      Signature
SVM Holdings SA                                  NEXUS MARITIME SERVICES Gmbh

Date: 16.05.2014

6

# MEMORANDUM OF AGREEMENT

Norwegian Shipbrokers Association Memo-
randum of Agreement for sale and purchase of
ships.Adopted by The Baltic and International
Maritime Council(BIMCO) in 1956
Code-name
**SALEFORM 1993**
Revised 1996, 1983 and 1986/87.

Dated : 15/ 05/ 2014

**SUMARINE DENIZCILIK A.S.of İstanbul , TURKEY**
hereinafter called the Sellers, have agreed to sell, and                              1

**NEXUS MARITIME SERVICES GmbH,LIBERIA**
hereinafter called the Buyers, have agreed to buy                                     2

Name : **M/V  SOY-1**                                                                 3

Classfication Society/Class  : *Lloyds Register/+100A1,Roll on-Roll of Cargo/Passenger Ship*   4
                              *Ice Class 3, UMS,+LMC*

Built : **1980**                 By: **Kawasaki Heavy Industiries Ltd,Sakaide/Japan**    5

Flag : Turkish                Place of Registration : **Istanbul**                     6

Call Sign : **TCFQ**                   Grt/ Nrt : **13867/4160**                       7

Register Number : **TUGS 06**                                                         8

hereinafter called the Vessel, on the following terms and conditions :                 9

**Definitions**                                                                       10

''Banking days''are days on which banks are open both in the country of the currency   11
stipulated  for the Purchase Price in Clause 1 and in the place of closing stipulated  in  Clause 8.   12

''In writting'' or ''written'' means a letter handed over from the Sellers to the Buyers or vice versa,   13
a registered letter,telex,telefax or other modern form of written communication.       14

''Classification Society'' or ''Class'' means the Society referred to in line 4.        15

**1. Purchase Price US$ 5,850,000.-(fivemillioneighthundredfiftythousandunitedstatesdollars)**   16

**2. Deposit**                                                                        17

As security for the correct fulfilment of this Agreement the Buyers shall pay a deposit of  **USD**   18
**540,000.-(fivehundredfourtythousandunitedstatesdollars)** of the Purchase Price within **three (3)**   19
banking days from the date of this Agreement.This deposit shall be placed with          20
and held ~~by them~~ in ~~a joint account for~~ the Sellers **account** ~~and the Buyers, to be released in~~   21
~~accordance with joint written instructions of the  Sellers and the Buyers. Interest,  if any, to be~~   22
~~credited to the Buyers.~~ Any fee charged for  holding the said deposit shall be borne ~~equally~~  by the   23
Sellers ~~and the Buyers.~~                                                            24

EXHIBIT
tabbies
2

3. **Payment**

The said Purchase Price shall be paid in full free of bank charges to **the Sellers account**

| | |
|---|---|
| BENEFICIARY | : SUMARINE DENIZCILIK A.S |
| BANK NAME | : GARANTI BANKASI A.S. |
| BRANCH NAME | : KARTAL/ISTANBUL |
| BRANCH CODE | : 091 |
| SWIFT | : TGBATRISXXX |
| IBAN | : TR72 0006 2000 0910 0009 0871 91 |

on delivery of the Vessel, but not later than 3 banking days after the Vessel is in every respect physically ready for delivery in accordance with the terms and conditions of this Agreement and Notice of Readiness has been given in accordance with Clause5.

4. **Inspections**

a)* The Buyers have inspected and accepted the Vessel's classification records.The Buyers have also inspected the Vessel at/in **Zonguldak** on **02nd May 2014**
and have accepted /**approved** the Vessel following this inspection and the sale is outright and definite subject only to the terms and conditions of this Agreement.

b)* ~~The buyers shall have the right to inspect the Vessel's classification records and declare whether same are accepted or not within~~

~~The Sellers shall provide for inspection of the Vessel at/in~~

~~The Buyers shall undertake the inspection without undue delay to the Vessel. Should the Buyers cause undue delay they shall compensate the Sellers for the losses thereby incurred. The Buyers shall inspect the Vessel without opening up and without cost to the Sellers. During the inspection, the Vessel's deck and engine log books shall be made available for examination by the Buyers.If the Vessel is accepted after such inspection,the sale shall become outright and definite, subject only to the terms and conditions of this Agreement, provided the Sellers receive written notice of acceptance from the Buyers within 72 hours after completion of such inspection.~~
~~Should notice of acceptance of the Vessel's classification records and of the Vessel not be received by the Sellers as aforesaid, the deposit together with interest earned shall be released immediately to the Buyers,whereafter this Agreement shall be null and void.~~

*~~4a) and 4b) are alternatives; delete whichever is not applicable.In the absence of deletions, alternative 4a) to apply.~~*

5. **Notices, time and place of delivery**

a)The Sellers shall keep the Buyers well informed of the Vessel's itinerary and shall provide the Buyers with **2 days approximate** and **1 days definite** notice of ~~the estimated~~ time of the arrival at the intented place of ~~drydocking/underwater inspection/~~ delivery.When the Vessel is at the place of delivery and in every respect physically ready for delivery in accordance with this Agreement, the Sellers shall give the Buyers a written Notice of Readiness for delivery.

b)The Vessel shall be delivered and taken over safely afloat at a safe and accessible berth or anchorage at/ in *Zonguldak- Istanbul range*

in the Seller's option.

Expected time of delivery : **29th May / 13 th June 2014**

Date of cancelling (see Clauses 5c),6b) (iii) and 14): **13 th June 2014 in the Sellers' option**

25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51
52
53
54
55
56
57
58
59
60
61

c)  If the Sellers anticipate that, notwithstanding the exercise of due diligence by them, the Vessel will not be ready for delivery by the cancelling date they may notify the Buyers in writting stating the date when they anticipate that the Vessel will be ready for delivery and propose a new cancelling date. Upon receipt of such notification the Buyers shall have the option of either cancelling this Agreement in accordance with Clause 14 within 7 running days of receipt of the notice or of accepting the new date as the new cancelling date.If the Buyers have not declared their option within 7 running days of receipt of the Seller's notification or if the Buyers accept the new date ,the date proposed in the Sellers' notification shall be deemed to be the new cancelling date and shall be substituted for the cancelling date stipulated in line 61.

If this Agreement is maintained with the new cancelling date all other terms and conditions hereof including those contained in Clauses 5 a) and 5 c) shall remain unaltered and in full force and·effect. Cancellation or failure to cancel shall be entirely without prejudice to any claim for damages the Buyers may have under Clause 14 for the Vessel not being ready by the original cancelling date

d)  Should the Vessel become an actual, constructive or compromised total loss before delivery the deposit together with interest earned shall be released immediately to the Buyers whereafter this Agreement shall be null and void.

**6.  Drydocking / Drivers Inspection  -**

a)** ~~The Sellers shall place the Vessel in drydock at the port of delivery for inspection by the Classification Society of the Vessel's underwater parts below the deepest load line, the extent of the inspection being in accordance with the Classification Society's rules. If the rudder, propeller, bottom or other underwater parts below the deepest load line are found broken, damaged or defective so as to affect the Vessel's class, such defects shall be made good at the Seller's expense to the satisfaction of the Classification Society without condition/recommendation.*~~

b)** (i)The Vessel is to be delivered without drydocking on ''as is where is'' basis at **Zonguldak-Istanbul range.** ~~However, the Buyers shall have the right at their expense to arrange for an underwater inspection by a diver approved by the Classification Society prior to the delivery of the Vessel. The Sellers shall at their cost make the Vessel available for such inspection. The extent of the inspection and the conditions under which it is performed shall be to the satisfaction of the Classification Society. If the conditions at the port of delivery are unsuitable for such inspection, the Sellers shall make the Vessel available at a suitable alternative place near to the delivery port.~~

~~(ii)If the rudder propeller bottom or other underwater parts below the deepest load line are found broken,damaged or defective so as to affect the Vessel's class, then unless repairs can be carried out afloat to the satisfaction of the Classification Society, the Sellers shall arrange for the Vessel to be drydocked at their expense for inspection by the Classification Society of the Vessel's underwater parts below the deepest load line, the extent of the inspection being in accordance with the Classification Society's rules.If the rudder,propeller,bottom or other underwater parts below the deepest load line are found broken,damaged or defective so as to affect the Vessel's class,such defects shall be made good by the Sellers at their expense to the satisfaction of the Classification Society without condition recommedition*. In such event the Sellers are to pay also for the cost of the underwater inspection and the Classification Society's attendance.~~

~~(iii) If the Vessel is to be drydocked pursuant to Clause 6b) (ii) and no suitable dry docking facilities are available at the port of delivery, the Sellers shall take the Vessel to a port where suitable drydocking facilities are available, whether within or outside the delivery range as per Clause 5b).Once drydocking has taken place the Sellers shall deliver the Vessel at the port of delivery a port within the delivery range as per Clause 5b)which shall ,for the purpose of this Clause become the new port of deliveryIn such event the cancelling date provided for in~~

~~Clause 5b)shall be extended by the additional time required for the drydocking and extra~~
~~steaming,but limited to a maximum of 14 runing days.~~

c) ~~If the Vessel is drydocked pursuant to Clause 6a) or 6 b) above~~
~~(i) the Classification Society may require survey of the tailshaft system,the extent of the survey~~
~~being to the satisfaction of the Classification surveyor.If such survey is not required by the~~
~~Classification Society,the Buyers shall have the right to require the tailsaft to be dawn and~~
~~surveyed by the Classification Society, the extent of the survey being in accordance with the~~
~~Classification Society's rules for tailsaft survey and consistent with the current stage of the~~
~~vessel's survey cycle. The Buyers shall declare whether they require the tailsaft to be drawn and~~
~~surveyed not later than by the completion of the inspection by the Classification Society .The~~
~~drawing and refitting of the tailsaft shall be arranged by the Sellers. Should any parts of the~~
~~tailshaft system be condemned or found defective so as to affect the Vessel's class, those parts~~
~~shall be renewed or made good at the Seller's expense to the satisfacition of the Classification~~
~~Society without condition / recommendation.*~~

~~(ii) the expenses relating to the survey of the tailshaft system shall be borne by the~~
~~Buyers unless the Classification Society requires such survey to be carried out,in which~~
~~case the Sellers shall pay these expenses. The Sellers shall also pay the expenses if the Buyers~~
~~require the survey and parts of the system are condemned or found defective or broken so as to~~
~~affect the Vessel's class*.~~

~~(iii) the expenses in connection with putting the Vessel in and taking her out of~~
~~drydock, including the drydock dues and the Classification Society's fees shall be paid by the~~
~~Sellers if the Classification Society issues any condition/recommendation* as a result of the~~
~~survey or if it requires survey of the tailshaft system. In all other cases the Buyers shall pay~~
~~the aforesaid expenses, dues and fees.~~

~~(iv)the Buyers' representative shall have the right to be present in the drydock, but without~~
~~interfering with the work or decisions of the Classification surveyor.~~

~~(v) the Buyers shall have the right to have the underwater parts of the Vessel cleaned~~
~~and painted at their risk and expense without interfering with the Sellers' or the Classification~~
~~surveyor's work, if any,and without affecting the Vessel's timely delivery. If, however, the Buyers'~~
~~work in drydock is still in progress when the Sellers have completed the work which the~~
~~Sellers are required to do, the additional docking time needed to complete the Buyers' work~~
~~shall be for the Buyers' risk and expense. In the event that the Buyers' work requires such additional~~
~~time, the Sellers may upon completion of the Sellers' work tender Notice of Readiness for~~
~~delivery whilst the Vessel is still in drydock and the Buyers shall be obliged to take delivery in~~
~~accordance with Clause 3, whether the Vessel is in drydock or not and irrespective of Clause 5 b)~~

~~* Notes, if any, in the surveyor's report which are accepted by the Classification Society without~~
~~condition/recommendation are not to be taken into account~~

~~** 6 a) and 6 b) are alternatives; delete whichever is not applicable. in the absence of deletions,~~
~~alternative 6 a) to apply.~~

## 7. Spares/bunkers, ete.

The Sellers shall deliver the Vessel to the Buyers with everything belonging to her on board and on
shore.All spare parts and spare equipment including spare tail-end shaft(s) and/or spare
propeller(s)/propeller blade(s), if any, belonging to the Vessel at the time of inspection used or
unused, whether on board or not shall become the Buyers' property, but spares on order are to be
excluded. Forwarding charges, if any, shall be for the Buyers' account. The Sellers are not required to
replace spare parts including spare tail-end shaft(s) and spare propeller(s)/propeller blade(s) which are
taken out of spare and used as replacement prior to delivery, but the replaced items shall be the property
of the Buyers.The radio installation and navigational equipment shall be included in the sale without
extra payment if they are the property of the Sellers.Unused stores and provisions shall ~~included~~
**excluded** the sale and be taken over by the Buyers without extra payment.

113
114
115
116
117
118
119
120
121
122
123
124
125
126
127
128
129
130
131
132
133
134
135
136
137
138
139
140
141
142
143
144
145
146
147
148
150
151
152
153
154
155
156
157
158
159
160
161
162
163
164

The Sellers have the right to take ashore crockery, plates, cutlery, linen and other articles bearing the Sellers' flag on name, provided they replace same with similar unmarked items.Library,forms, etc., exclusively for use in the Sellers' vessel(s), shall be excluded  without compensation. Captain's, Officers' and Crew's personal belongings including slop chest are to be excluded from the sale, as well as the following additional items  ~~(including items on hire)~~: **No hired items on board** .

The Buyers shall take over  the remaining bunkers and unused lubricating oils in storage tanks sealed drums and pay the current net market price (~~excluding~~ including barging expenses) at the port and date of delivery of the Vessel. Payment under this Clause shall be made at the same time and place and in the same  currency as the Purchase Price.

## 8.Documentation

The place of closing:  **in ISTANBUL**

~~In exchange for payment of the Purchase Price the Sellers shall furnish the Buyers with delivery documents, namely:~~

~~a)     Legal Bill os Sale in a form recordable in (the country in which the  Buyers    are    to register the Vessel), warranting that the Vessel is free from all encumbrances, mortages and maritime liens or any other debts or claims whatsoever, duly notarially attested and legalized by the consul of such country or other competent authority.~~

~~b)     Current Certificate of Ownership issued by the competent authorities of the flag state state of the Vessel.~~

~~c)     Confirmation of Class issued within 72 hours prior to delivery.~~

~~d)     Current Certificate issued by the competent authorities stating that the Vessel is free from registered encumbrances.~~

~~e)     Certificate of Deletion of the Vessel from the Vessel's registry or other official evidence of deletion appropriate to the Vessel's registry at the time of delivery, or, in the event that the registry does not as a matter of practice issue such documentation immediately, a written undertaking by the Sellers  to effect deletion from the Vessel's registry forthwith and furnish a Certificate or other official evidence of deletion to the Buyers promptly an latest within 4 (four) weeks after the Purchase Price has been paid and the Vessel has been delivered.~~

~~f)     Any such additional documents as may reasonably be regired by the competent authorities for the purpose of registering the Vessel, provided the  Buyers notify the Sellers of any such documents as soon as possible after   the date of this Agreement.~~

~~At the time of delivery the Buyers and Sellers shall sign and deliver to each other a Protocol of Delivery and Acceptance confirming the date and time of delivery of the Vessel from the Sellers to the Buyers.~~

~~At the time of delivery the Sellers shall hand to the Buyers the classification certificate(s) as well as all plans etc., which are on board the Vessel. Other certificates which are on board the Vessel shall also be handed over to the Buyers unless the Sellers are required to retain same, in which case the Buyers to have the right to take   copies. Other  technical documentation  which may be in the Sellers possession shall be promptly forwarded to the Buyers at their expense, if they so reguest. The Sellers may keep the Vessel's log books but the Buyers to have the right to take ~~copi~~~~

## 9. Encumbrances

The Sellers warrant that the Vessel, at the time of delivery, is free from all charters, encumbrances, mortgages and maritime liens or any other debts whatsoever. The Sellers hereby undertake to indemnify the Buyers against all consequences of claims made against the Vessel which have been incurred prior to the time of delivery.

## 10.Taxes, etc.

Any taxes, fees and expenses in connection with the purchase and registration under the Buyers flag shall be for the Buyers account, whereas similar charges in connection with the closing of the Sellers register shall be for the Sellers account.

## 11. Condition on delivery

The Vessel with everything belonging to her shall be at the Sellers risk and expense until she is delivered to the Buyers, but subject to the terms and conditions of this Agreement she shall be delivered and taken over as she was at the time of inspection, fair wear and tear excepted. However, the Vessel shall be delivered with her class maintained without condition/ recommendation*, free of average damage affecting the Vessel's class, and with her classification certificates and national certificates, as well as all other certificates the Vessel had at the time of inspection, valid **for a minimum period of 3(three)months** and unextended without condition/ recommendation* by Class or the relevant authorities at the time of delivery.

"Inspection" in this Clause 11, shall mean the Buyers inspection according to Clause 4 a) or 4 b), if applicable, or the Buyers' inspection prior to the signing of this Agreement. If the Vessel is taken over without inspection, the date of this Agreement shall be the relevant date.

*. Notes, if any, in the surveyor's report which are accepted by the Classification Society without condition/recommendation are not to be taken into account.

## 12. Name/markings

Upon delivery the Buyers undertake to change the name of the Vessel and alter funnel markings.

## 13. Buyers' default

Should the deposit not be paid in accordance with Clause 2, the Sellers have the right to cancel this Agreement, and they shall be entitled to claim compensation for their losses and for all expenses incurred together with interest.
Should the Purchase Price not be paid in accordance with Clause3,the Sellers have the right to cancel the Agreement, in which case the deposit together with interest earned shall be released to the Sellers.If the deposit does not cover their loss,the Sellers shall be entitled to claim further compensation for their losses and for all expenses incurred together with interest.

## 14. Sellers' default

Should the Sellers fail to give Notice of Readiness in accordance with Clause5a)or fail to be ready to validly complete a legal transfer by the date stipulated in line 61 the Buyers shall have the option of cancelling this Agreement provided always that the Sellers shall be granted a maximum of 3 banking days after Notice of Readiness has been given to make arrangements for the documentation set out in Clause 8. If after Notice of Readiness has been given but before the Buyers have taken delivery, the Vessel ceases to be physically ready for delivery and is not made physically ready again in every respect by the date stipulated in line 61 and new Notice of Readiness given, the Buyers shall retain their option to cancel. in the event that the Buyers elect to cancel this Agreement the deposit together with interest earned shall be released to them immediately.
Should the Sellers fail to give Notice of Readiness by the date stipulated in line 61 or fail to be ready to validly complete a legal transfer as aforesaid **the deposit together with interest earned shall be released to the Buyers** they shall make due compsation to the

Buyers ~~for their loss and for all expenses together with interest~~ if their failure is due to proven negligence and whether or not the Buyers cancel this Agreement.

## 15. Buyers' representatives

After this Agreement has been signed by both parties and the deposit has been lodged, the Buyers have the right to place **three** representatives on board the Vessel at their sole risk and expense ~~upon arrival at            on or about~~
These representatives are on board for the purpose of familiarisation and in the capacity of observers only, and they shall not interfere in any respect with the operation of the Vessel **However, the Sellers' Officers and crew are to offer every assistance in demonstrating the Vessel's workings to the Buyers' representatives whils on board**
The Buyer's represestantives shall sign the Sellers' letter of indemnity prior to their embarkation

## 16. Arbitration

a)*    This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of this Agreement shall be  to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force, one arbitrator being appointed by each party. On the receipt by  one party of the nomination in writing of the other party's arbitrator, that  party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

b)*    ~~This Agreement shall be governed by and construed in accordance with Title 9 of the United States Code and the Law of the State of New York and should any dispute arise out of this Agreement, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the   parties hereto, and the third by the two so chosen;  their decision or that of any two of them shall be final, and for purpose of enforcing any award, this Agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. New York.~~

c)*    ~~Any dispute arising out of this Agreement shall be referred to arbitration at subject to the procedures applicable there.               The laws of shall govern this Agreement~~

*       *16 a), 16 b) and 16 c) are alternatives; delete whichever is not applicable. In the absence of deletions, alternative 16 a) to apply.*

***Clause 17 and 21, both inclusive and herewith attached, are deemed to form an integral part of this Memorandum of Agreement.***

For and on behalf of <u>the Sellers</u>                          For and on behalf of <u>the Buyers</u>

SUMARINE DENIZCILIK A.S.                          NEXUS MARITIME SERVICES GmbH



SUMARINE DENIZCILIK A.Ş.
Ankara Caddesi No: 85 K: 4
Kartal - İSTANBUL
Kartal V.D. 7820627673

### to the Memorandum of Agreement
### dated 15th May 2014 concerning the sale of the
### M/V SOY-1

Between :

**Messrs Sumarine Denizcilik A.S.**
  hereinafter called the ''Sellers'', on the one part,

And

**Messrs Nexus Maritime Services GmbH**
  hereinafter called the ''Buyers'', on the other part,

IT HAS BEEN MUTUALLY AGREED AS FOLLOWS:

**Clause 17-** The Buyers are to produce the following documents to the Sellers at the document closing;

1-A notarized and apostilled copy of '' Certificate of Registry'' given by official commercial registy of the Buyers showing name of company, registered number, date, address, type of company and representatives of the company.

2-A notarized and apostilled copy of '' Extract of the Registry''

3-A notarized and apostilled copy of ''Signature of Circular'' showing the members of the board of directors; names of managers, who and how authorised to sign.

4-A notarized and apostilled copy of the Minutes of Meeting of the board of directors approving the purchase of the Vessel according to the Memorandum of Agreement dated 15th May 2014 and listing person(s) who is/are authorised to sign documents and bank account

5-A notarized and apostilled copy of Power of Attorney in favour of the person(s) authorised to sign the documents on the bank account and the deposit account and whatsoever.

6-All documents to be in English or with an English translation, both original and translation to be legalized by apostille.

**Clause 18.** -Pursuant to clause 8 of the here above mentioned Memorandum of Agreement, the Sellers shall deliver to the Buyers the following documents

On delivery/closing of the vessel the following documents will be supplied by the Sellers to the Buyers in accordance with the Memorandum of Agreement:

1) Minutes of meeting of the board of directors fo the Sellers authorising the sale of the Vessel, execution of delivery, bill of sale etc, approval of the Memorandum of Agreement and appointing a person or persons to represent the Sellers on the sale and to execute the bill of sale, the protocol of delivery and acceptance, to collect the purchase price and all other documents necessary to effect the sale and transfer of the Vessel to the ownership of the Buyers. - 3 originals

2) Power of Attorney of the Sellers authorising a person or persons to sign and execute the bill of sale, the protocol of delivery and acceptance and any and all other documents to effect the sale and transfer of the Vessel to the Buyers – 3 originals

3) Extract from Chamber of Commerce for Selling Company

4) Two(2) originals of the Memorandum of Agreement

5) Two (2) originals Legal Bill of Sale (English Form 10-A) of the Vessel specifying vessel to be free from all encumbrances and maritime liens and any other debts whatsoever, duly notarized and apostilled in TURKEY

6) Seller's invoice for the bunkers, lubricating oils remaining on board in clause 7 of MOA dd. 15th May 2014 in three(3) originals, all duly signed by the Sellers,

7) Protocol of delivery and acceptance signed by representatives of the Buyers/Sellers at the time/place of closing

8) Two(2) originals of a Letter of Undertaking from the Sellers to Supply the Buyers with the Certificate of Deletion from the TUGS Registry withing fourteen(14) days after physical delivery of the Vessel to the Buyers. The Certificate of Deletion shall be delivered in one(1) original.

9) Sellers will hand over at the time of delivery all manuals/plans and drawings on board and ashore which are in their possesion.

**Clause 19-** It is herewith agreed that the Buyers will buy the sister vessel M/V SOY-2 simultaneously under different M.O.A but this MOA will only be valid and come into force after buyers signing of MOA and paying the deposit to the Sellers account with respect to the sale of the sister vessel M/V SOY-2

**Clause 20.** All other terms and conditions of the here above mentioned Memorandum of Agreement remain valid, in force and unaltered.

**Clause 21-** The terms and conditions of this Agreement are to be kept Private and confidential.

Issued and signed in TWO (2) original copies, on the 15th May 2014

For and on behalf of the Sellers

For and on behalf of the Buyers

SUMARINE DENIZCILIK A.S.

NEXUS MARITIME SERVICES GmbH

SUMARINE DENIZCILIK A.S.
Ankara Caddesi No: 85 K: 4
Kartal İSTANBUL
Kartal VD: 7820627673

# MEMORANDUM OF AGREEMENT

Norwegian Shipbrokers Association Memorandum of Agreement for sale and purchase of ships.Adopted by The Baltic and International Maritime Council(BIMCO) in 1956
Code-name
**SALEFORM 1993**
Revised 1996, 1983 and 1986/87.

Dated : **15/ 05/ 2014**

**SUMARINE DENIZCILIK A.S.of İstanbul , TURKEY**
hereinafter called the Sellers, have agreed to sell, and

**NEXUS MARITIME SERVICES GmbH,LIBERIA**
hereinafter called the Buyers, have agreed to buy

Name : **M/V  SOY-2**

Classfication Society/Class  : *Lloyds Register/+100A1,Roll on-Roll of Cargo/Passenger Ship*
*Ice Class 3, UMS,+LMC*

Built : **1980**                    By: **Kawasaki Heavy Industiries Ltd,Sakaide/Japan**

Flag  : **Turkish**                Place of Registration : **Istanbul**

Call Sign : **TCFW**                Grt/ Nrt : **13867/4160**

Register Number : **TUGS 07**

hereinafter called the Vessel, on the following terms and conditions :

## Definitions

''Banking days''are days on which banks are open both in the country of the currency
stipulated  for the Purchase Price in Clause 1 and in the place of closing stipulated  in  Clause 8.

''In writting'' or ''written'' means a letter handed over from the Sellers to the Buyers or vice versa,
a registered letter,telex,telefax or other modern form of written communication.

''Classification Society'' or ''Class'' means the Society referred to in line 4.

## 1. Purchase Price US$ 6,050,000.-(sixmillionfiftythousandunitedstatesdollars)

## 2. Deposit

As security for the correct fulfilment of this Agreement the Buyers shall pay a deposit of  **USD
540,000.-(fivehundredfourtythousandunitedstatesdollars)** of the Purchase Price within  **three (3)**
banking days from the date of this Agreement.This deposit shall be placed with
and held ~~by them~~ in ~~a joint account for~~ the Sellers **account** ~~and the Buyers, to be released in
accordance with joint written instructions of the  Sellers and the Buyers. Interest,  if any, to be
credited to the Buyers.~~ Any fee charged for  holding the said deposit shall be borne ~~equally~~  by the
Sellers ~~and the Buyers.~~

EXHIBIT
3
exhibit

**3.    Payment**

The said Purchase Price shall be paid in full free of bank charges to **the Sellers account**
BENEFICIARY          : SUMARINE DENIZCILIK A.S
BANK NAME           : GARANTI BANKASI A.S.
BRANCH NAME       : KARTAL/ISTANBUL
BRANCH CODE        : 091
SWIFT                    : TGBATRISXXX
IBAN                      : TR72 0006 2000 0910 0009 0871 91
on delivery of the Vessel, but not later than 3 banking days after the Vessel is in every respect
physically ready for delivery in accordance with the terms and conditions of this Agreement
and Notice of Readiness has been given in accordance with Clause5.

**4.    Inspections**

a)*    The Buyers have  inspected and accepted the Vessel's classification records.The Buyers have
also inspected the Vessel at/in **Zonguldak** on **02nd May 2014**
and have accepted /**approved** the Vessel following this inspection and the sale is outright and
definite subject only to the terms and conditions of this Agreement.

b)*    ~~The buyers shall have the right to inspect the Vessel's classification records and declare~~
~~whether same are accepted or not within~~

~~The Sellers shall provide for inspection of the Vessel at/in~~

~~The Buyers shall undertake the inspection without undue delay to the Vessel. Should the~~
~~Buyers  cause undue delay they shall compensate the Sellers for the losses thereby incurred.~~
~~The Buyers shall inspect the Vessel without opening up and without cost to the Sellers.~~
~~During the inspection, the Vessel's deck and engine log books shall be made available for~~
~~examination by the Buyers.If the Vessel is accepted after such inspection,the sale shall~~
~~become outright and definite, subject only to the terms and conditions of this Agreement,~~
~~provided the Sellers receive written notice of acceptance from the Buyers within 72 hours~~
~~after completion of such inspection.~~
~~Should notice of acceptance of the Vessel's classification records and of the Vessel not be~~
~~received by the Sellers as aforesaid, the deposit together with interest earned shall be~~
~~released immediately to the Buyers,whereafter this Agreeement shall be null and void.~~

~~1a) and 1b) are alternatives; delete whichever is not applicable.In the absence of~~
~~deletions, alternative 1a) to apply.~~

**5.    Notices, time and place of delivery**

a)The Sellers shall keep the Buyers well informed of the Vessel's itinerary and shall provide
the Buyers with **2 days  approximate** and 1 days **definite** notice of  the ~~estimated~~
time of the arrival at the intented place of ~~drydocking/underwater inspection/~~ delivery.When
the Vessel is at the place of delivery and in every respect physically ready for delivery in
accordance with this Agreement, the Sellers shall give the Buyers  a written Notice of
Readiness for delivery.

b)The Vessel shall be delivered and taken over safely afloat at a safe and accessible  berth or
anchorage  at/ in *Zonguldak- Istanbul range*

in the Seller's option.

Expected time of delivery : **29th May / 13 th June 2014**

Date of cancelling (see Clauses 5c),6b) (iii) and 14): **13 th June 2014 in the Sellers' option**

c)    If the Sellers anticipate that, notwithstanding the exercise of due diligence by them, the **62**
Vessel will not be ready for delivery by the cancelling date they may notify the Buyers in **63**
writting stating the date when they anticipate that the Vessel will be ready  for delivery and **64**
propose a new cancelling date. Upon receipt of such notification the Buyers shall have the **65**
option of either cancelling this Agreement in accordance with  Clause 14 within 7 running **66**
days of receipt of the notice or of accepting the new date as the new cancelling date.If the **67**
Buyers have not declared their option within 7 running days of receipt of the Seller's **68**
notification or if the Buyers accept the new  date ,the date proposed in the Sellers' notification **69**
shall be deemed to be the new  cancelling date and shall be substituted for the cancelling date **70**
stipulated in line 61. **71**

If this Agreement is maintained  with the new cancelling date all other terms and conditions **72**
hereof including those contained in Clauses 5 a) and 5 c) shall remain unaltered and in full **73**
force and effect. Cancellation or failure to cancel shall be entirely without prejudice to any **74**
claim for damages the Buyers may have under Clause 14 for the Vessel not being ready by **75**
the original cancelling date **76**

d)    Should the Vessel become an actual, constructive or compromised total loss before delivery **77**
the deposit together with interest earned shall  be released immediately to the Buyers **78**
whereafter this Agreement shall be null and void. **79**

**6.    Drydocking / Drivers Inspection -** **80**

~~a)** The Sellers shall place the Vessel in drydock at the port of delivery for inspection by the~~ **81**
~~Classification Society of the Vessel's underwater parts below the deepest load line, the extent~~ **82**
~~of the inspection being in accordance with the Classification Society's rules. If the rudder,~~ **83**
~~propeller, bottom or other underwater parts below the deepest load line are found  broken,~~ **84**
~~damaged or defective so as to affect the Vessel's class, such defects shall be made good at the~~ **85**
~~Seller's   expense   to   the   satisfaction   of   the   Classification   Society   without~~ **86**
~~condition/recommendation.*~~ **87**

b)** (i)The Vessel is to be delivered without drydocking **on ''as is where is'' basis at** **88**
**Zonguldak-Istanbul range.** ~~However, the Buyers shall have the right at their expense to~~ **89**
~~arrange for an underwater inspection by a diver  approved by the Classification Society~~ **90**
~~prior to the delivery of the Vessel. The  Sellers shall at their cost make the Vessel available~~ **91**
~~for such inspection. The extent of the inspection and the conditions under which it is~~ **92**
~~performed shall be to the satisfaction of the Classification Society. If the conditions at the~~ **93**
~~port of delivery  are unsuitable for such inspection, the Sellers shall make the Vessel~~ **94**
~~available at a suitable alternative place near to the delivery port.~~ **95**

~~(ii)If the rudder propeller bottom or other underwater parts below the deepest  load line are~~ **96**
~~found broken,damaged or defective so as to affect the Vessel's class, then unless repairs can~~ **97**
~~be carried out afloat to the satisfaction of the Classification  Society, the Sellers shall arrange~~ **98**
~~for the Vessel to be drydocked at their expense for inspection by the Classification Society of~~ **99**
~~the Vessel's underwater parts below the deepest load line, the extent of the inspection~~ **100**
~~being in accordance  with the Classification Society's rules.If the rudder,propeller,bottom~~ **101**
~~or other underwater parts below the deepest load line are found broken,damaged or defective~~ **102**
~~so as to  affect the Vessel's class,such defects shall be made  good by the Sellers at their~~ **103**
~~expense to  the satisfaction of the Classification Society without condition recommendtion*.~~ **104**
~~In such event the Sellers are to pay also for the cost of  the underwater inspection and  the~~ **105**
~~Classification Society's attendance.~~ **106**

~~(iii) If the Vessel is to be drydocked pursuant to Clause 6b) (ii) and no suitable dry-docking~~ **107**
~~facilities are available at the port of delivery, the Sellers shall take the Vessel to a port where~~ **108**
~~suitable drydocking facilities are available, whether within or outside  the delivery range as~~ **109**
~~per Clause 5b).Once drydocking has taken place the Sellers shall deliver the Vessel at the port~~ **110**
~~of delivery  a port within the delivery range as per Clause 5b)which shall ,for the purpose of~~ **111**
~~this Clause,become the new port of deliveryIn such event the cancelling date provided for in~~ **112**

~~Clause 5b)shall be extended by the additional time required for the drydocking and extra steaming,but limited to a maximum of 14 runing days.~~

~~c) If the Vessel is drydocked pursuant to Clause 6a) or 6 b) above~~
~~(i) the Classification Society may require survey of the tailshaft system,the extent of the survey being to the satisfaction of the Classification surveyor.If such survey is not required by the Classification Society,the Buyers shall have the right to require the tailsaft to be dawn and surveyed by the Classification Society, the extent of the survey being in accordance with the Classification Society's rules for tailsaft survey and consistent with the current stage of the vessel's survey cycle. The Buyers shall declare whether they require the tailsaft to be drawn and surveyed not later than by the completion of the inspection by the Classification Society .The drawing and refitting of the tailsaft shall be arranged by the Sellers. Should any parts of the tailshaft system be condemned or found defective so as to affect the Vessel's class, those parts shall be renewed or made good at the Seller's expense to the satisfaction of the Classification Society without condition / recommendation.\****

~~(ii) the expenses relating to the survey of the tailshaft system shall be borne by the Buyers unless the Classification Society requires such survey to be carried out,in which case the Sellers shall pay these expenses. The Sellers shall also pay the expenses if the Buyers require the survey and parts of the system are condemned or found defective or broken so as to affect the Vessel's class\*.~~

~~(iii) the expenses in connection with putting the Vessel in and taking her out of drydock, including the drydock dues and the Classification Society's fees shall be paid by the Sellers if the Classification Society issues any condition/recommendation\* as a result of the survey or if it requires survey of the tailshaft system. In all other cases the Buyers shall pay the aforesaid expenses, dues and fees.~~

~~(iv)the Buyers' representative shall have the right to be present in the drydock, but without interfering with the work or decisions of the Classification surveyor.~~

~~(v) the Buyers shall have the right to have the underwater parts of the Vessel cleaned and painted at their risk and expense without interfering with the Sellers' or the Classification surveyor's work, if any,and without affecting the Vessel's timely delivery. If, however, the Buyers' work in drydock is still in progress when the Sellers have completed the work which the Sellers are required to do, the additional docking time needed to complete the Buyers' work shall be for the Buyers' risk and expense. In the event that the Buyers' work requires such additional time, the Sellers may upon completion of the Sellers' work tender Notice of Readiness for delivery whilst the Vessel is still in drydock and the Buyers shall be obliged to take delivery in accordance with Clause 3, whether the Vessel is in drydock or not and irrespective of Clause 5 b)~~

~~\* Notes, if any, in the surveyor's report which are accepted by the Classification Society without condition/recommendation are not to be taken into account~~

~~\*\* 6 a) and 6 b) are alternatives; delete whichever is not applicable. in the absence of deletions, alternative 6 a) to apply.~~

## 7. Spares/bunkers, etc.

The Sellers shall deliver the Vessel to the Buyers with everything belonging to her on board and on shore.All spare parts and spare equipment including spare tail-end shaft(s) and/or spare propeller(s)/propeller blade(s), if any, belonging to the Vessel at the time of inspection used or unused, whether on board or not shall become the Buyers' property, but spares on order are to be excluded. Forwarding charges, if any, shall be for the Buyers' account. The Sellers are not required to replace spare parts including spare tail-end shaft(s) and spare propeller(s)/propeller blade(s) which are taken out of spare and used as replacement prior to delivery, but the replaced items shall be the property of the Buyers.The radio installation and navigational equipment shall be included in the sale without extra payment if they are the property of the Sellers.Unused stores and provisions shall ~~included~~ **excluded** ~~the~~ sale and/be taken over by the Buyers with~~out~~ extra payment.

The Sellers have the right to take ashore crockery, plates, cutlery, linen and other articles bearing the Sellers' flag on name, provided they replace same with similar unmarked items.Library,forms, etc., exclusively for use in the Sellers' vessel(s), shall be excluded without compensation. Captain's, Officers' and Crew's personal belongings including slop chest are to be excluded from the sale, as well as the following additional items ~~(including items on hire)~~: *No hired items on board.One(1)pc undersize main engine crankshaft is included in the sale.*

The Buyers shall take over the remaining bunkers and unused lubricating oils in storage tanks sealed drums and pay the current net market price (~~excluding~~ including barging expenses) at the port and date of delivery of the Vessel. Payment under this Clause shall be made at the same time and place and in the same currency as the Purchase Price.

## 8.Documentation

The place of closing: **in ISTANBUL**

~~In exchange for payment of the Purchase Price the Sellers shall furnish the Buyers with delivery documents, namely:~~

~~a) Legal Bill os Sale in a form recordable in (the country in which the Buyers are to register the Vessel), warranting that the Vessel is free from all encumbrances, mortages and maritime liens or any other debts or claims whatsoever, duly notarially attested and legalized by the consul of such country or other competent authority.~~

~~b) Current Certificate of Ownership issued by the competent authorities of the flag state state of the Vessel.~~

~~c) Confirmation of Class issued within 72 hours prior to delivery.~~

~~d) Current Certificate issued by the competent authorities stating that the Vessel is free from registered encumbrances.~~

~~e) Certificate of Deletion of the Vessel from the Vessel's registry or other official evidence of deletion appropriate to the Vessel's registry at the time of delivery, or, in the event that the registry does not as a matter of practice issue such documentation immediately, a written undertaking by the Sellers to effect deletion from the Vessel's registry forthwith and furnish a Certificate or other official evidence of deletion to the Buyers promptly an latest within 4 (four) weeks after the Purchase Price has been paid and the Vessel has been delivered.~~

~~f) Any such additional documents as may reasonably be reguired by the competent authorities for the purpose of registering the Vessel, provided the Buyers notify the Sellers of any such documents as soon as possible after the date of this Agreement.~~

~~At the time of delivery the Buyers and Sellers shall sign and deliver to each other a Protocol of Delivery and Acceptance confirming the date and time of delivery of the Vessel from the Sellers to the Buyers.~~

~~At the time of delivery the Sellers shall hand to the Buyers the classification certificate(s) as well as all plans etc., which are on board the Vessel. Other certificates which are on board the Vessel shall also be handed over to the Buyers unless the Sellers are required to retain same, in which case the Buyers to have the right to take copies. Other technical documentation which may be in the Sellers possession shall be promptly forwarded to the Buyers at their expense, if they so reguest. The Sellers may keep the Vessel's log books but the Buyers to have the right to take copies of same.~~

## 9. Encumbrances

The Sellers warrant that the Vessel, at the time of delivery, is free from all charters, encumbrances, mortgages and maritime liens or any other debts whatsoever. The Sellers hereby undertake to indemnify the Buyers against all consequences of claims made against the Vessel which have been incurred prior to the time of delivery.

## 10. Taxes, etc.

Any taxes, fees and expenses in connection with the purchase and registration under the Buyers flag shall be for the Buyers account, whereas similar charges in connection with the closing of the Sellers register shall be for the Sellers account.

## 11. Condition on delivery

The Vessel with everything belonging to her shall be at the Sellers risk and expense until she is delivered to the Buyers, but subject to the terms and conditions of this Agreement she shall be delivered and taken over as she was at the time of inspection, fair wear and tear excepted. However, the Vessel shall be delivered with her class maintained without condition/ recommendation*, free of average damage affecting the Vessel's class, and with her classification certificates and national certificates, as well as all other certificates the Vessel had at the time of inspection, valid **for a minimum period of 3(three)months** and unextended without condition/ recommendation* by Class or the relevant authorities at the time of delivery.

"Inspection" in this Clause 11, shall mean the Buyers inspection according to Clause 4 a) ~~or 4 b)~~, if applicable, or the Buyers' inspection prior to the signing of this Agreement. ~~If the Vessel is taken over without inspection, the date of this Agreement shall be the relevant date.~~

~~*- Notes, if any, in the surveyor's report which are accepted by the Classification Society without condition/recommendation are not to be taken into account.~~

## 12. Name/markings

Upon delivery the Buyers undertake to change the name of the Vessel and alter funnel markings.

## 13. Buyers' default

Should the deposit not be paid in accordance with Clause 2, the Sellers have the right to cancel this Agreement, and they shall be entitled to claim compensation for their losses and for all expenses incurred together with interest.
Should the Purchase Price not be paid in accordance with Clause3, the Sellers have the right to cancel the Agreement, in which case the deposit together with interest earned shall be released to the Sellers. If the deposit does not cover their loss, the Sellers shall be entitled to claim further compensation for their losses and for all expenses incurred together with interest.

## 14. Sellers' default

Should the Sellers fail to give Notice of Readiness in accordance with Clause5a)or fail to be ready to validly complete a legal transfer by the date stipulated in line 61 the Buyers shall have the option of cancelling this Agreement provided always that the Sellers shall be granted a maximum of 3 banking days after Notice of Readiness has been given to make arrangements for the documentation set out in Clause 8. If after Notice of Readiness has been given but before the Buyers have taken delivery, the Vessel ceases to be physically ready for delivery and is not made physically ready again in every respect by the date stipulated in line 61 and new Notice of Readiness given, the Buyers shall retain their option to cancel. in the event that the Buyers elect to cancel this Agreement the deposit together with interest earned shall be released to them immediately.
Should the Sellers fail to give Notice of Readiness by the date stipulated in line 61 or fail to be ready to validly complete a legal transfer as aforesaid **the deposit together with interest earned shall be released to the Buyers** ~~they shall make due compsation to the~~

| |
|---|
| 207 |
| 208 |
| 209 |
| 210 |
| 211 |
| 212 |
| 213 |
| 214 |
| 215 |
| 216 |
| 217 |
| 218 |
| 219 |
| 220 |
| 221 |
| 222 |
| 223 |
| 224 |
| 225 |
| 226 |
| 227 |
| 228 |
| 229 |
| 230 |
| 231 |
| 232 |
| 233 |
| 234 |
| 235 |
| 236 |
| 237 |
| 238 |
| 239 |
| 240 |
| 241 |
| 242 |
| 243 |
| 244 |
| 245 |
| 246 |
| 247 |
| 248 |
| 229 |
| 250 |
| 251 |
| 252 |

Buyers ~~for their loss and for all expenses together with interest~~ if their failure is due to proven negligence and whether or not the Buyers cancel this Agreement.

## 15. Buyers' representatives

After this Agreement has been signed by both parties and the deposit has been lodged, the Buyers have the right to place **three** representatives on board the Vessel at their sole risk and expense ~~upon arrival at~~ ~~on or about~~
These representatives are on board for the purpose of familiarisation and in the capacity of observers only, and they shall not interfere in any respect with the operation of the Vessel **However, the Sellers' Officers and crew are to offer every assistance in demonstrating the Vessel's workings to the Buyers' representatives whils on board**
The Buyer's represetantives shall sign the Sellers' letter of indemnity prior to their embarkation

## 16. Arbitration

a)*    This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of this Agreement shall be to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force, one arbitrator being appointed by each party. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall apply. If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

b)*    ~~This Agreement shall be governed by and construed in accordance with Title 9 of the United States Code and the Law of the State of New York and should any dispute arise out of this Agreement, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this Agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc. New York.~~

c)*    ~~Any dispute arising out of this Agreement shall be referred to arbitration at subject to the procedures applicable there. The laws of shall govern this Agreement.~~

*    *16 a), 16 b) and 16 c) are alternatives; delete whichever is not applicable. In the absence of deletions, alternative 16 a) to apply.*

*Clause 17 and 21, both inclusive and herewith attached, are deemed to form an integral part of this Memorandum of Agreement.*

For and on behalf of the Sellers                    For and on behalf of the Buyers

SUMARINE DENIZCILIK A.S.                    NEXES MARITIME SERVICES GmbH

SUMARINE DENIZCILIK A.Ş.
Ankara Caddesi No: 85 K: 4
Kartal - İSTANBUL
Kartal V.D. 7820827873

## ADDENDUM NUMBER ONE

### to the Memorandum of Agreement
### dated 15th May 2014 concerning the sale of the
### M/V SOY-2

Between :

**Messrs Sumarine Denizcilik A.S.**
hereinafter called the ''Sellers'', on the one part,

And

**Messrs Nexus Maritime Services GmbH**
hereinafter called the ''Buyers'', on the other part,

IT HAS BEEN MUTUALLY AGREED AS FOLLOWS:

**Clause 17**- The Buyers are to produce the following documents to the Sellers at the document closing;

1-A notarized and apostilled copy of '' Certificate of Registry'' given by official commercial registy of the Buyers showing name of company, registered number, date, address,type of company and representatives of the company.

2-A notarized and apostilled copy of '' Extract of the Registry''

3-A notarized and apostilled copy of ''Signature of Circular'' showing the members of the board of directors,names of managers,who and how authorised to sign.

4-A notarized and apostilled copy of the Minutes of Meeting of the board of directors approving the purchase of the Vessel according to the Memorandum of Agreement dated 15th May 2014 and listing person(s) who is/are authorised to sign documents and bank account

5-A notarized and apostilled copy of Power of Attorney in favour of the person(s) authorised to sign the documents on the bank account and the deposit account and whatsoever.

6-All documents to be in English or with an English translation, both original and translation to be legalized by apostille.

**Clause 18.** -Pursuant to clause 8 of the here above mentioned Memorandum of Agreement, the Sellers shall deliver to the Buyers the following documents

On delivery/closing of the vessel the following documents will be supplied by the Sellers to the Buyers in accordance with the Memorandum of Agreement:

1) Minutes of meeting of the board of directors fo the Sellers authorising the sale of the Vessel, execution of delivery, bill of sale etc, approval of the Memorandum of Agreement and appointing a person or persons to represent the Sellers on the sale and to execute the bill of sale, the protocol of delivery and acceptance, to collect the purchase price and all other documents necessary to effect the sale and transfer of the Vessel to the ownership of the Buyers. - 3 originals

2)Power of Attorney of the Sellers authorising a person or persons to sign and execute the bill of sale, the protocol of delivery and acceptance and any and all other documents to effect the sale and transfer of the Vessel to the Buyers – 3 originals

3)Extract from Chamber of Commerce for Selling Company

4) Two(2) originals of the Memorandum of Agreement

5) Two (2) originals Legal Bill of Sale (English Form 10-A) of the Vessel specifying vessel to be free from all encumbrances and maritime liens and any other debts whatsoever, duly notarized and apostilled in TURKEY

6) Seller's invoice for the bunkers, lubricating oils remaining on board in clause 7 of MOA dd. 15th May 2014 in three(3) originals, all duly signed by the Sellers,

7) Protocol of delivery and acceptance signed by representatives of the Buyers/Sellers at the time/place of closing

8) Two(2) originals of a Letter of Undertaking from the Sellers to Supply the Buyers with the Certificate of Deletion from the TUGS Registry withing fourteen(14) days after physical delivery of the Vessel to the Buyers. The Certificate of Deletion shall be delivered in one(1) original.

9) Sellers will hand over at the time of delivery all manuals/plans and drawings on board and ashore which are in their possesion.

**Clause 19-** It is herewith agreed that the Buyers will buy the sister vessel M/V SOY-1 simultaneously under different M.O.A but this MOA will only be valid and come into force after buyers signing of MOA and paying the deposit to the Sellers account with respect to the sale of the sister vessel M/V SOY-1

**Clause 20.**All other terms and conditions of the here above mentioned Memorandum of Agreement remain valid, in force and unaltered.

**Clause 21-** The terms and conditions of this Agreement are to be kept Private and confidential.

Issued and signed in TWO (2) original copies, on the 15th May 2014

For and on behalf of the Sellers                    For and on behalf of the Buyers

SUMARINE DENIZCILIK A.S.              NEXUS MARITIME SERVICES GmbH

SUMARINE DENIZCILIK A.Ş.
Ankara Caddesi No: 85 K: 4
Kartal ISTANBUL
Kartal V.D. 7820627873

03 Haziran 2014

No 17461

# BILL OF SALE (Body Corporate) KARTAL 12.NOTERİ
SEDAT TOROS

| Official Number | Name of Ship | Port of registry/TUGS No: | Whether a sailing, steam or motor ship | Horse power of engines (if any) | Number of Tons | | |
|---|---|---|---|---|---|---|---|
| | | | | | | Gross | Net |
| 7822160 | SOY-1 | ISTANBUL / 06 | Motor Ship | 10550 BHP | | 13867 | 4160 |

| | | Meter | CMS |
|---|---|---|---|
| Registered Length | | 130 | 00 |
| Registered Breadth | | 22 | 60 |
| Registered Depth | | 14 | 20 |

and as described in more detail in the Register Book.

We, (a) SUMARINE DENIZCILIK.Ş (hereinafter called "the Transferors") having our principal place of business at Aşağı Kordonboyu Mah. Ankara Cad. No:85 Kartal/İstanbul-TURKEY in consideration of the sum of USD 5,850,000 (United States Dollars fivemillioneighthundredfiftythousand) paid to us by (b) NEXUS MARITIME SERVICES GmbH (hereinafter called "the Transferee(s)" 80 Broad Street, Monrovia,Liberia the Receipt whereof is hereby acknowledged, transfer all shares in the Ship above particularly described, and in her boats and appurtenances, to the said Transferee(s).

Further, we, the Transferors for ourselves and our successors covenant with the said Transferee(s) and (c) ...their... assigns, that we have power to transfer in manner aforesaid the premises hereinbefore expressed to be transferred, and that the same are free from encumbrances (d) any and all mortgages, maritime liens, charters,debts,taxes and claims whatsoever

In witness whereof we have executed this Bill of Sale on 03.06.2014.

TRANSFERORS:
SUMARINE DENIZCILIK A.S

AS Attorney HATICE UNLU KARAAGAC

SUMARINE Denizcilik A.Ş.
Ankara Caddesi No:85 K: 4
Kartal / İSTANBUL
V.D. Kartal 7820827673

TRANSFEREE :
NEXUS MARITIME SERVICES GmbH

AS Attorney

BİLGİN TERCÜMANLIK
YAYINCILIK VE TUR.LTD. ŞTİ.
Postane Mh. Yalıboyu Cad. No: 83/
174.004 2.
Tuzla / İST  Tuzla V.D.
Ticaret Sicil No 21547

T.C
KARTAL 12. NOTERLİĞİ
Sedat TOROS
Tel:0 216 395 48 30-395 12 76 Fax 395 63 97
Cami Mh. İstasyon Cd. No:44/B Tuzla/İST

KARTAL 12. NOTERİ
SEDAT TOROS Vekili
Başkatip
ERDAL KARATAS

Sworn Translator
Yeminli Tercüman
Mehmet ÇATAK

NOTE. Insert (a) (b) names, address and description of transferors and transferees. (c) Insert "his", "her" or "their". (d) Insert name and address in full, and description of transferees (e) Insert "his", "her or their" and "save as appears by the Registry of the said Ship".

(f) In the event of the ship being subject to any mortgage or mortgages, the following words should be added to the Bill of Sale:— "save as appears by the Registry of the said Ship".

(g) If executable in FULL of the Body Corporate.    (h) Insert name and address in full, and description of transferees. (c) Insert "his", "her" or "their".

There be any subsisting Mortgage or outstanding Certificate of Mortgage or Sale, add "save as appears by the Registry of the said Ship".

NOTE. Before a transfer of a registered British vessel there not obtain a complete certificate until the Bill of Sale has been recorded on the Port of Registry of the ship and any change of residence on the part of the owner or mortgagees are reminded of the importance of keeping the Register of British Ships informed of any change of residence or description.

Sec. 8  2658 (Aug. 1973)

EXHIBIT
4

I hereby certify that the signatures under this BILL OF SALE, which has been issued and presented to our Office for certification, belong to **HATICE ÜNLÜ KARAAĞAÇ, holder of Turkish ID Card no 16618098278** and who was born in Istanbul on 06.11.1970 as a daughter of Mehmet and Saliha, registered in Ankara, Nallihan District, Nasuhpasa Neighborhood under binder no 3, family entry no 99, and individual entry no 18 according to the identity card with a sealed photo issued by Pendik Public Registration Office on 25.06.2009 under the registration no 20725 and serial no 110/87685, and that she still resides at the above address, and to **VALERII REVUNKOV** of Russian Nationality, born on 10.07.1951 according to the passport translation which was certified by Kartal 12th Notary Public on 03.06.2014 under journal entry no 17459 regarding the passport no MC3004 with validity until 11.04.2024, and who speaks English language and who still resides at the above address, and they all signed in my presence in my office on the third day of June, two thousand and fourteen, 03/06/2014.

**BASIS:**

1/ Upon examination of the power of attorney issued by "SUMARINE DENIZCILIK ANONIM ŞIRKETI" certified by KARTAL 1st Notary Public on 02.06.2014 under journal entry no 10226, it has been understood that HATICE ÜNLÜ KARAAĞAÇ is authorized to sign this BILL OF SALE.

2/ Upon examination of the power of attorney issued by NEXUS MARITIME SERVICE GMBH certified on 21.05.2014 under no G-86463 by SOFIANA KONTOURI a Special Agent of LIBERIA MARITIME AUTHORITY, the translation of which was certified by Kartal 12th Notary Public on 03.06.2014 under journal entry no 17458, it has been understood that VALERII REVUNKOV is authorized to sign this BILL OF SALE.

**KARTAL 12th NOTARY PUBLIC**
**SEDAT TOROS**

BILGIN TERCÜMANLIK
YAYINCILIK VE TURIZM LTD. ŞTI.
Postane Mh. Yalıboyu Cd. No: 83/
Tuzla / IST   Tuzla VD. 174 004 2
Ticaret Sicil No: 21547

KARTAL 12.NOTERİ
SEDAT TOROS
0 3 Haziran 2014

# SATIŞ SENEDİ (ŞİRKETLER İÇİN)

№ 17461

| Gemi Sicil No. | Geminin adı | Tescil Limanı / TUGS no | Yelkenli, Buharlı ya da motorlu gemi | Makinelerin toplam gücü (eğer varsa) |
|---|---|---|---|---|
| 7822160 | "SOY-1" | İSTANBUL / 06 | MOTORLU GEMİ | 10550 BHP |

|  | Metre | Cm | Brüt | Net |
|---|---|---|---|---|
| Tescilli uzunluk | 22 | 60 | | |
| En | 14 | 20 | | |
| Derinlik | 130 | 00 | | |
| Ve sicil defterinde tanımlanmış olduğu gibidir. | | | 13867 | 4160 |

Tonajlar

Biz faaliyet merkezi Aşağı Kordonboyu Mah. Ankara Cad. No: 85 Kartal / İSTANBUL, TÜRKİYE adresinde mukim aşağıda imzası bulunan (a) SUMARINE DENİZCİLİK A.Ş. (bundan böyle "devreden" olarak anılacaktır) ve (b) *80 Broad Street, Monrovia, Liberya* adresinde mukim NEXUS MARITIME SERVICES *GMBH* (bundan sonra "devralan" olarak anılacak) tarafından, tarafımıza ödenen ve tahsil edildiği teyit edilen *5.850.000 USD* (beş milyon sekiz yüz elli bin Amerikan doları) karşılığında özellikleri yukarıda tanımlanmış gemiyi hisselerinin % 100 (yüzde yüz) ve avadanlıkları ile birlikte devralana transfer ediyoruz.

Ayrıca bizler, yukarıda ifade edilen devreden sıfatı ile gerek kendi adımıza gerekse varislerimiz adına hem devreden hem de (c) onların vekillerine yukarıda tanımlanmış olan geminin yukarıda ifade edildiği şekilde transfer etme hakkına haiz olduğumuzu, adı geçen gemi üzerinde her hangi takyidat (d) ipotek, deniz alacağı, kiralama, borçlar, vergiler ve her türlü talepler olmadığını teyit ederiz.

Tasdik olarak bu satış senedi 03.06.2014 tarihinde noter huzurunda düzenlenmiştir.

SUMARINE DENİZCİLİK A.Ş.

Vekil sıfatıyla: HATİCE ÜNLÜ KARAAGAÇ

Vekil sıfatıyla

*NEXUS MARITIME SERVICES GMBH*

Vekil sıfatıyla.

KARTAL 12. NOTERİ
SEDAT TOROS Vekili
Başkatip
ERDAL KARA...

BİLGİN TERCÜMANLIK
YAYINCILIK VE TURİZM LTD. Ş...
Postane Mh. Yalıköy Cd. No: 83/
174.004-2.
Tuzla / İST Tuzla/İSTAN... VD.
Ticaret Sicil No 21547

Swom Translator
Yeminli Tercüman
Mehmet ÇATAK

(a) Hukuki şahsın açık adı (b) Bireyler olması halinde devir alanların açık isim ve adresleri, "ortak mal sahipleri"ibaresinin eklenmesi.(c) "onun" veya "onlar..."
NOT: Eğer mevcut ipotekler varsa, "adı geçen gemi sicilinde görünenin dışında"ibaresini ekleyiniz.(e) Şahitlerin imzaları ve tanımları, örneğin Müdür, sekreter, vs.
yol açar.
NOT: Tescilli bir Britanya gemisinin alıcısı, Satış Senedi geminin sicil limanına kaydedilinceye kadar tam mülkiyete sahip olmaz. Bu durumun ihmal edilmesi ciddi sonuçlara
NOT: Limanda ikamet değişiklikleri hakkında Britanya Gemi Sicilinin haberdar edilmesi hususu, tescili mal sahipleri ve ipotekçilere işbirlikte bulunur.

Dışarıda hazırlanan ve onay için noterliğimize getirilen SATIŞ SENEDİ altındaki imzaların gösterildiği
Pendik Nüfus Müdürlüğü'nden verilmiş 25/06/2009 tarih, 20725 kayıt, 110 seri ve 879685 numaralı
fotoğraflı Nüfus Cüzdanına göre Ankara ili, Nallıhan ilçesi, Nasuhpaşa mahallesi/köyü, 3 cilt, 99 aile
sıra, 18 sıra numaralarında nüfusa kayıtlı olup, baba adı Mehmet , ana adı Saliha , doğum tarihi
6/11/1970, doğum yeri İstanbul olan ve halen yukarıdaki adreste bulunduğunu, okuryazar olduğunu
bildiren 16618098278 T.C. kimlik numaralı HATİCE ÜNLÜ KARAAĞAÇ ile gösterildiği
KARTAL 12 Noterliği'nin 03/06/2014 tarih ve 17459 numaralı işlem ile çevrisi yapılmış olan MC
23004 verilmiş, geçerlilik tarihi 11/04/2024 , PASAPORT TERCÜMESİ'ne göre RUSYA
FEDERASYONU uyruklu, 10/07/1951 doğum tarihli, İNGİLİZCE dilini bilen, okuryazar olduğunu,
halen yukarıdaki adreste oturduğunu, pasaport numarasını 72 852196I olduğunu bildiren VALERİİ
REVUNKOV isimli kişilere ait olduğunu noterlikte huzurumda alındığını, onaylarını, Üç Haziran
İkibinondört, Salı günü 03/06/2014

DAYANAK:

1/ KARTAL 1.Noterliği'nden 02.06.2014 tarih ve 10226 yevmiye nosu ile tanzim ve tasdikli
SUMARINE DENİZCİLİK ANONİM ŞİRKETİ'nin verdiği vekaletnamedeki yetkilerin
incelenmesinden HATİCE ÜNLÜ KARAAĞAÇ'ın işbu satış senedini imzalamaya yetkili olduğu
görülmüştür.

2/ KARTAL 12.Noterliği'nden 03.06.2014 tarih ve 17458 yevmiye nosu ile tercümesi tanzim ve
tasdikli LİBERYA DENİZCİLİK MAKAMI ÖZEL TEMSİLCİSİ SOFIANA KONTOURİ tarafından
imzalanan 21.05.2014 tarih G-86463 onay nolu NEXUS MARITIME SERVICES GMBH tarafından
verilen vekaletnamedeki yetkilerin incelenmesinden VALERİİ REVUNKOV'un işbu satış senedini
imzalamaya yetkili olduğu görülmüştür.

KARTAL 12.NOTERİ



KARTAL 12.NOTERİ
SEDAT TOROS
Başkatip
ERDAL KAR...

BİLGİN TERCÜMANLIK
YAYINCILIK VE TURİZM LTD
Postane Mh. Yalıköyü Cd
Tuzla / İST  Tuzla VD
Ticaret Sicil No.



Türkiye Cumhuriyeti

№ 70226

Tarih: 02/06/2014
Yev.No: [?]

Dışarıda hazırlanan ve onay için noterliğimize getirilen bu işlem (N.K.90.md.) altındaki imzaların 7820627673 vergi numaralı SUMARINE DENIZCILIK ANONIM ŞİRKETİ YETKİLİSİ olarak hareket eden, gösterdiği Kartal Pendik Nüfus Müdürlüğünden verilme 26/06/2009 tarih, 20107 kayıt, M11 seri ve 561397 numaralı fotoğraflı Nüfus Cüzdanına göre Ankara ili, Nallıhan ilçesi, Nasuhpaşa mahallesi/köyü, 3 cilt, 99 aile no, 12 sıra numaralarında nüfusa kayıtlı olup, baba adı Emin Ali, ana adı Bedriye, doğum tarihi 5/1/1984, doğum yeri Nallıhan olan ve halen yukarıdaki adreste bulunduğunu, okuryazar olduğunu bildiren 16656097604 T.C. kimlik numaralı UĞUR KARAAĞAÇ ile 7820627673 vergi numaralı SUMARINE DENIZCILIK ANONIM ŞİRKETİ adına YETKİLİ olarak hareket eden, gösterdiği Kastamonu Nüfus Müdürlüğünden verilme 29/07/2010 tarih, 253 kayıt, G11 seri ve 391101 numaralı Nüfus Cüzdanına göre Kastamonu ili, Bozkurt / Kastamonu ilçesi, Beldeğirmen mahallesi/köyü, 12 cilt, 89 aile sıra, 37 sıra numaralarında nüfusa kayıtlı olup, baba adı Salih, ana adı Mehmet, doğum tarihi 6/10/1974, doğum yeri Bozkurt olan ve halen yukarıdaki adreste bulunduğunu, okuryazar olduğunu bildiren 26153010467 T.C. kimlik numaralı SALIH ÜNLÜ isimli kişilerin ait olduğunu işlerinin çokluğu nedeniyle şahsen gelemeyebilecekleri beyanıyla mazbatalı olduğundan ANKARA CAD.NO.85 KARTAL İSTANBUL adresinde mahallinde huzuruma alındığını, onayladım. İki haziran ikibindört, Pazartesi günü 02/06/2014

KARTAL 1. NOTERİ

Ayla KESİMAL
Yerine
Ara DÜMBE[?]
İmzaya yetkili
Vekil

DAYANAK: KARTAL 1. Noterliğinden 12/10/2011 tarih ve 24737 yevmiye no ile başdikili imza sirkülerinin incelenmesinden SUMARINE DENIZCILIK ANONIM ŞİRKETİ ünvanlı şirketi Müşterek imzalarıyla UĞUR KARAAĞAÇ, SALIH ÜNLÜ isimli kişilerin imza sirküleri metninde yazılı olduğu şekilde temsile yetkili olduğu görüldü.

VEKALETNAME

Şirketimiz namına malik bulunduğumuz gemileri dilediği koşullarda NEXUS MARITIME SERVICES isimli firmaya satmaya, gemileri satmak için gerekli görüşmeleri yapmaya, müzakere etmeye, gemilerin satış GMBB'ye, satmaya, gemileri satmak için gerekli sözleşmeleri imzalamaya, gemilerin satış bedellerini tahsil etmeye, gemileri Türk Uluslararası Gemi Siciline devir ve tescil ettirmeye, ihracat işlerini yapmaya ve Gemi Sicilinde gemilerin terkin işlemlerini yapmaya, gemilerin yurtdışına satışı ve ilgili beyanların ve dökümanların imzalanmaya, bağlantı ihraca, edenen [?], gemilerin, çarşını gerçekleştirmeye, gemileri hukuken ve fiilen devir ve teslim etmeye, gemilerin satışları ile ilgili resmi kurumlarda işlemler yapmaya, işlemleri takibe, sonuçlandırmaya, .bayralarda bulunmaya ve aynı taahhütnameler yetkili olonak üzere Mehmet kızı 16656058278 T.C. Kimlik Numaralı Hatice Ünlü Karaağaç ve Mehmet oğlu, 1979 doğumlu, 26143106964 T.C. kimlik Numaralı SEMİH ÜNLÜ tarafımızdan vekil tayin edildi.

VEKİL EDENLER : SUMARINE DENIZCILIK ANONIM ŞİRKETİ
KARTAL V.D : 782 062 7673
adına MÜŞTEREKEN hareketle:

UĞUR KARAAĞAÇ ( T.C KİMLİK NO:16656097604)

SALIH ÜNLÜ ( T.CKİMLİK NO: 26153010467 )

No 17461

0 3 Haziran 2014

№ 70226

№ 70226

T.C.
KARTAL 1. NOTERLİĞİ
SAYI: 589 40 99 FAX: 589 48 80
Tel: 589 40 99

0 2 HAZİRAN 2014

KARTAL 12. NOTERİ
SEDAT TOROS YEMİN
ERDA...

03 Haziran 2014

№ 17 458

№ 17 461

CHRISTOFOROS KONTAKOS
NEXUS MARITIME SERVICES GMBH

EXHIBIT
5

# BILL OF S

Form No. 10A

*[Stamp: KARTAL 12.NOTERİ SEDAT TOROS]*

*[Stamp: T.C. KARTAL 12. NOTERLİĞİ Sedat TOROS — Cami Mh. İstasyon Cd. No.44/B Tuzla/İST. Tel:0 216 395 46 30-395-72-75 Fax:396 63 97]*

| IMO Number | 7822184 | Name of Ship | SOY-2 |
|---|---|---|---|

Registered Depth

Registered Breadth

Registered Length

and as described in more detail in the Register Book:

We, (a) SUMARINE DENIZCILIK A.S [hereinafter called "the Trans
Kartal/Istanbul-TURKEY in consideration of the sum of USD 6,050
GmbH [hereinafter called "the Transferee(s)" 80 Broad Street, /
Ship above particularly described, and in her boots and appurte

Further, we, the Transferors for ourselves and our successors cove
transfer in manner aforesaid the premises hereinbefore expresse
mortgages, maritime liens, charters,debts,taxes and claims what

In witness whereof we have executed this Bill of Sale on 03.06.20

TRANSFERORS:
SUMARINE DENIZCILIK A.S

*[Stamp: SUMARINE DENIZCILIK A.S Ankara Cad... Kartal V... ...0627873]*

As Attorney: HATICE UNLU KARAAGAC

(a) Insert title in FULL of the Body Corporate.    (b) Insert name and address in full and description
(c) If there be any subsisting Mortgage, or outstanding Certificate of Mortgage or Sale, add "save as 1
NVPK—A purchaser of a registered British vessel does not obtain a complete title until the Bill of S
NVPK.—Registered Owners or mortgagees are reminded of the importance of the maintenance of full

---

APOSTILLE
( Convention de La Haye du 5 Octobre 1961 )

1. Ülke/Country/Pays/Staat: TÜRKİYE - LA TURQUIE

İşbu resmi belge/This public document/Le présent acte public/Dieses zeugnis wurde

2. Erdal KARATAŞ tarafından imzalanmıştır./Has been signed by/a été signé par/durch ... unterschreiben

3. İmzalayanın sıfatı BAŞKATİP'dir./Acting in the capacity of/Agissant en qualité de/Titel des Unterzeichneten

4. Kartal 12.Noterliği 'nin mühür/damgasını taşımaktadır./bears the seal/stamp of-/est revêtu du sceau/timbre de-trägt Siegel/Stempel von

TASDİK / CERTIFIED / ATTESTE / BEGLAUBIGUNG:

5. Tuzla Kaymakamlığı'nda/at/à/in

6. 4.6.2014 günü/the/le/Am

7. Yazı İşleri Müdürü Seyhan ATCI tarafından/by/par/durch den/die

8. No : 869 ile tasdik edilmiştir./No:/sous No:/unter Nr.

9. Mühür - Damga/Seal-stamp/Sceau- timbre/Siegel-Stempel

10. İmza/Signature/Signature/Unterschrift:

Form No. 104

Described by the spaces Registrar
of Customs & Excise with the
authority of the Secretary of State
for Trade and Industry

# BILL OF SALE (Body Corporate)

KARTAL 12.NOTERİ
SEDAT TOROS

T.C.
KARTAL 12. NOTERLİĞİ
Sedat TOROS
Tel:0 216 395 48 30-395 72 75 Fax:395 63 97
Cami Mh. İstasyon Cd. No:44/B Tuzla/İST

| | Name of Ship | Port of registry/TUGS No: | Whether a sailing, steam or motor ship | | | Horse power (if any) |
|---|---|---|---|---|---|---|
| IMO Number | SOY - 2 | ISTANBUL / 07 | Motor Ship | | | 10550 BHP |
| 7822184 | | | | | | |

| | | Meter | CMS | Number of Tons |
|---|---|---|---|---|
| Registered Length | | 22 | 60 | |
| Registered Breadth | | 14 | 20 | Gross |
| Registered Depth | | 130 | 00 | 13867 |
| | | | | Net |
| | | | | 4160 |

Registered Depth

and as described in more detail in the Register Book.

We, (a) SUMARINE DENIZCILIK A.S (hereinafter called "the Transferors") having our principal place of business at Asagi Kordonboyu Mah, Ankara Cad. No:85 Kartal/Istanbul-TURKEY in consideration of the sum of USD 6.050.000 (United States Dollars sixmillionfiftythousand) paid to us by (b) NEXUS MARITIME SERVICES GmbH [hereinafter called "the Transferee(s)" 80 Broad Street, Monrovia,Liberia the Receipt whereof is hereby acknowledged, transfer ...all... shares in the Ship above particularly described, and in her boats and appurtenances, to the said Transferee(s).

Further, we, the Transferors for ourselves and our successors covenant with the said Transferee(s) and (c) ...their... assigns, that we have power to transfer in manner aforesaid the premises hereinbefore expressed to be transferred, and that the same are free from encumbrances (d) any and all mortgages, maritime liens, charters,debts,taxes and claims whatsoever

In witness whereof we have executed this Bill of Sale on 03.06.2014.

TRANSFERORS:
SUMARINE DENIZCILIK A.S

As Attorney: HATICE UNLU KARAAGAC

SUMARINE DENIZCILIK A.Ş.
Ankara Cad. No: 85 K: 4
Kartal / İstanbul
Kartal V.D. 7870827873

TRANSFEREE :
NEXUS MARITIME SERVICES GmbH

As Attorney
Valeri Pevsnov

KARTAL 12. NOTERİ
SEDAT TOROS
Başkatip
ERDAL KAR...

BİLGİN TERCÜMANLIK
YAYINCILIK VE TURİZM LTD. ŞTİ
Postane Mh. Yalıboyu Cd. No: 83/
174.004 2.
Tuzla /İST    Tuzla V.D
Ticaret Sicil No: 21547

Sworn Translator
Yeminli Tercüman
Mehmet ÇATAK

(a) Insert title in FULL of the Body Corporate.    (b) Insert name and address in full and description of transferees. (c) Insert "his", "her" or "their"
difference the way subsisting Mortgage, or outstanding Certificate of Mortgage or Sale, held "save as appears by the Registry of the said Ship"
NOTE. - A purchaser of a registered British vessel does not obtain a complete title to the Ship until the Bill of Sale has been recorded at the Port of Registry of the ship and neglect of this precaution may entail serious consequences.
NOTE. - Registered Owners or mortgagees are reminded of the importance of registering any change of residence on their part.
Sec. 17, 1858 (Aug. 1875)

KARTAL 12.NOTERİ
SEDAT TOROS

SATIŞ SENEDİ (ŞİRKETLER İÇİN)

03 Haziran 2014

№ 11

Ticaret Bakanı rızasıyla
Gümrük ve Vergi Şube
Müdürleri emrine

Biz faaliyet merkezi Aşağı Kordonboyu Mah. Ankara Cad. No: 85 Kartal / İSTANBUL, TÜRKİYE adresinde mukim aşağıda imzası bulunan (a) SUMARINE DENİZCİLİK A.Ş. (bundan böyle "devreden" olarak anılacaktır) ve (b) 80 Broad Street, Monrovia, Liberya adresinde mukim NEXUS MARITIME SERVICES GMBH (bundan sonra "devralan" olarak anılacak) tarafından, tarafımıza ödenen ve tahsil edildiği teyit edilen 6.050.000 USD (altı milyon elli bin Amerikan doları) karşılığında özellikleri yukarıda tanımlanmış gemiyi hisselerinin % 100 (yüzde yüz) ve avadanlıkları ile birlikte devralana transfer ediyoruz.

Ayrıca bizler, yukarıda ifade edilen devreden sıfatı ile gerek kendi adımıza gerekse varislerimiz adına hem devralan hem de (c) onların vekillerine yukarıda tanımlanmış olan geminin yukarıda ifade edildiği şekilde transfer etme hakkına haiz olduğumuzu, adı geçen gemi üzerine her hangi takyidat (c) ipotek, deniz alacağı, kiralama, borçlar, vergiler ve her türlü talepleri olmadığını teyit ederiz.

Tasdik olarak bu satış senedi 03.06.2014 tarihinde noter huzurunda düzenlenmiştir.

| Gemi Sicil No. | Geminin adı | Tescil Limanı / TUGS no | Yelkenli, Buharlı ya da motorlu gemi | Makinelerin toplam gücü (eğer varsa) |
|---|---|---|---|---|
| 7822184 | "SOY-2" | İSTANBUL / 07 | MOTORLU GEMİ | 10550 BHP |

| | Metre | Cm | Tonajlar | |
|---|---|---|---|---|
| Tescili izamlık | 22 | 60 | Brüt | Net |
| Boy | 14 | 20 | 13867 | 4160 |
| Derinlik | 130 | 00 | | |

Ve sicil defterinde tanımlandığı gibidir.

SUMARINE DENİZCİLİK A.Ş.

Vekil sıfatıyla: HATİCE UNLU KARAAGAC

NEXUS MARITIME SERVICES GMBH

Vekil sıfatıyla:

KARTAL 12. NOTERİ
SEDAT TOROS Vekili
Başkatip
ERDAL KARA...

NOT: (a) Hukuki şahsın açık adı (b) Bireyler ölmüş halinde devir alanların açık adresleri, "ortak mal sahipleri" ibaresinin eklenmesi.(c) "onun" veya "onların" NOT: Eğer mevcut ipotekler varsa, "adı geçen gemi sicilinde görünenin dışında" ibaresini ekleyiniz.(e) Şahitlerin imzaları ve tanımları, örneğin Müdür, sekreter, vs. NOT: Tescilli bir Britanya gemisinin alıcısı, Satış Senedi geminin sicil limanına kaydedilinceye kadar tam mülkiyete sahip olmaz. Bu durumun ihmal edilmesi ciddi sonuçlar yol açar.
NOT: Limanda ikamet değişiklikleri hakkında Britanya Gemi Sicilinin haberdar edilmesi hususu, tescilli mal, sahipleri ve ipotekçilere işbu iade hararetlidir.

BİLGİN TERCÜMANLIK
YAYINCILIK VE TURİZM LTD. ŞT
Postane Mh. Yalıboyu Cd. No: 83/
174.004. 2t.
Tuzla / İST Tuzla VD
Ticaret Sicil No 21547

Sworn Translator
Yeminli Tercüman
Mehmet ÇATAK

I hereby certify that the signatures under this BILL OF SALE, which has been issued and presented for certification, belong to HATICE ÜNLÜ KARAAĞAÇ, holder of Turkish ID Card 16611809827 8 and who was born in Istanbul on 06.11.1970 as a daughter of Mehmet and Salih, registered in Ankara, Nallihan District, Naşuhpaşa Neighborhood under binder no 3, family entry no 99, and individual entry no 18 according to the identity card with a sealed photo issued by Pendik Public Registration Office on 25.06.2009 under the registration no 20725 and serial no J10/879685, and that she still resides at the above address, and to VALERII REVUNKOV of Russian Nationality, born on 10.07.1951 according to the passport translation which was certified by Kartal 12ᵗʰ Notary Public on 03.06.2014 under journal entry no 17459 regarding the passport no MC23004 with validity until 11.04.2024, and who speaks English language and who still resides at the above address, and they all signed in my presence in my office on the third day of June, two thousand and fourteen, 03/06/2014.

BASIS:

1/ Upon examination of the power of attorney issued by " SUMARINE DENIZCILIK ANONIM ŞIRKETI" certified by KARTAL 1ˢᵗ Notary Public on 02.06.2014 under journal entry no 10226, it has been understood that HATICE ÜNLÜ KARAAĞAÇ is authorized to sign this BILL OF SALE.

2/ Upon examination of the power of attorney issued by NEXUS MARITIME SERVICE GMBH certified on 21.05.2014 under no G-86463 by SOFIANA KONTOURI a Special Agent of LIBERIA MARITIME AUTHORITY, the translation of which was certified by Kartal 12ᵗʰ Notary Public on 03.06.2014 under journal entry no 17458, it has been understood that VALERII REVUNKOV is authorized to sign this BILL OF SALE.

KARTAL 12th NOTARY PUBLIC
SEDAT TOROS

BILGIN TERCÜMANLIK
YAYINCILIK VE TURIZM LTD. ŞTİ
Postane Mh. Yalıyolu Cd. No: 83
Tuzla / İST Tuzla VD. 174 004 2
Ticaret Sicil No 21547

Dışarıda hazırlanan ve onay için noterliğimize getirilen **SATIŞ SENEDİ** altındaki imz.,

Pendik Nüfus Müdürlüğü'nden verilmiş 25/06/2009 tarih, 20725 kayıt, J10 seri ve 87968

fotoğraflı Nüfus Cüzdanına göre Ankara ili, Nallıhan ilçesi, Nasuhpaşa mahallesi/köyü, 3 c.,

sıra, 18 sıra numarasında nüfusa kayıtlı olup, baba adı Mehmet , ana adı Saliha , doğum tar,

6/11/1970, doğum yeri İstanbul olan ve halen yukarıdaki adreste bulunduğunu, okuryazar old,

bildiren 1661809**8278 T.C. kimlik numaralı HATİCE ÜNLÜ KARAAĞAÇ** ile gösterdiği

KARTAL 12.Noterliği'nin 03/06/2014 tarih ve 17459 numaralı işlemi ile çevrisi yapılmış olan MC

23004 verilme, geçerlilik tarihi 11/04/2024, **PASAPORT TERCÜMESİ** 'ne göre RUSYA

FEDERASYONU uyruklu, 10/07/1951 doğum tarihli, İNGİLİZCE dilini bilen, okuryazar oldu.

REVUNKOV isimli kişilere ait olduğunu, pasaport numarasının 72 8321961 olduğunu bildiren **VALERI**

**REVUNKOV**'un notere ait olduğunu noterlikte huzurumda alındığını, onayların, Üç Haziran

İkibinondört, Salı günü 03/06/2014

**DAYANAK:**

1/ KARTAL 1.Noterliği'nden 02.06.2014 tarih ve 10226 yevmiye nosu ile tanzim ve tasdikli

**SUMARINE DENİZCİLİK ANONİM ŞİRKETİ**'nin verdiği vekaletnamedeki yetkililerin

incelenmesinden HATİCE ÜNLÜ KARAAĞAÇ'ın işbu satış senedini imzalamaya yetkili olduğu

görülmüştür.

2/ KARTAL 12.Noterliği'nden 03.06..2014 tarih ve 17458 yevmiye nosu ile tercümesi tanzim ve

tasdikli LİBERYA DENİZCİLİK MAKAMI ÖZEL TEMSİLCİSİ SOFİANA KONTOURİ tarafından

imzalanan 21.05.2014 tarih G-86463 onay nolu NEXUS MARİTIME SERVICES GMBH tarafından

verilen vekaletnamedeki yetkililerin incelenmesinden **VALERI REVUNKOV**'un işbu satış senedini

imzalamaya yetkili olduğu görülmüştür.

**KARTAL 12.NOTERİ**



SEDAT TOROS

KARTAL 12. NOTERİ

SEDAT TOROS V...

Başkat...

ERDAL KA...

BİLGİN TERCÜMANLIK
YAYINCILIK VE TURİZM LTD. Ş
Postane Mh. Yalıboyu Cd No 33
Tuzla /İST Tuzla/VD 174 004 2.
Ticaret SicilNo 21547

# Türkiye Cumhuriyeti

**VEKALETNAME**

Dışarıda hazırlanıp ve onay için noterliğimizde getirilen bu işlem (N.K.Sö.md.) altındaki imzaların 7820627673 vergi numaralı SUMARINE DENİZCİLİK ANONİM ŞİRKETİ adına YETKİLİSİ olarak hareket eden, göstermiş olduğu Pendik Nüfus Müdürlüğünden verilmiş 26/06/2009 tarih, 20107 kayıt, M11 seri ve 161397 numaralı fotoğraflı Nüfus Cüzdanına göre Ankara ili, Nallıhan ilçesi, Nasuhpaşa mahallesi/köyü, 3 cilt, 99 aile sıra, 12 sıra numaralarında kayıtlı olup, baba adı Emin Ali, ana adı Belkaye, doğum tarihi 5/1/1984, doğum yeri Nallıhan olan ve halen yukarıda adresinde bulunduğunu, okuryazar olduğunu bildiren SUMARINE DENİZCİLİK ANONİM ŞİRKETİ adına YETKİLİSİ olarak hareket eden, göstermiş olduğu Kastamonu Nüfus Müdürlüğünden verilmiş 29/07/2010 tarih, ... vergi numarası SUMARINE DENİZCİLİK ANONİM ŞİRKETİ adına YETKİLİSİ olarak hareket eden, göstermiş .... fotoğraflı Nüfus Cüzdanına göre Kastamonu ili, Bozkurt / Kastamonu ilçesi, ... mahallesi/köyü, ... cilt, 89 aile sıra, 37 sıra numaralarında kayıtlı olup, baba adı Mehmet, ana adı Salha, doğum tarihi 6/10/1974, doğum yeri İstanbul olan ve halen yukarıdaki adresinde bulunduğunu, okuryazar olduğunu bildiren 26150106472 T.C. Kimlik numaralı SALİH ÜNLÜ isimli kişilere ait olduğunu işlemin çokluğu nedeniyle daireye kadar gelmeyeceklerini beyanla mazeretli olduğunu, gösterdiği ... T.C. Kimlik numaralı UĞUR KARAAĞAÇ ANKARA ... isimli kişinin adresinde mahalinde huzurumda aldırdıklarını onayladım. İki Haziran İkibinondört, Pazartesi günü 02/06/2014

DAYANAK: KARTAL 1. Noterliğinden 12/10/2011 tarih ve 24797 yevmiye no ile tasdikli imza sirkülerinin incelenmesinde SUMARINE DENİZCİLİK ANONİM ŞİRKETİ ünvanlı şirketi Müşterek imzalarıyla UĞUR KARAAĞAÇ, SALİH ÜNLÜ isimli kişilerin imza sirkileri metninde yazılı olduğu şekilde temsile yetkili olduğu görüldü.

**VEKİL EDENLER : SUMARINE DENİZCİLİK ANONİM ŞİRKETİ**

KARTAL V.D – 7820627673

adına MÜŞTEREKEN hareketle

UĞUR KARAAĞAÇ (T.C.KİMLİK NO: 16836097604.)

adına MÜŞTEREKEN hareketle

SALİH ÜNLÜ ( T.C.KİMLİK NO: 26150106472.)

Şirketin, namına malik bulunduğumuz gemileri diledği koşularca NEXUS MARITIME SERVICES GMBH'e satmaya, gemileri satmak için gerekli görüşmeleri yapmaya, müzakere etmeye, gemilerin satış sözleşmelerini imzalamaya, gemilerin satış bedellerini tahsil etmeye, gemileri Türk Uluslar arası Gemi Sicilinde devir ve teslim etmeye, ihracat işlemi yapmaya ve Gemi Sicilinde gemilerin işlemlerini yapmaya, gemilerin yurtdışına satışı ile ilgili beyanları ve dökümanları imzalamaya, belgeleri ibraza , eden evrak alıp vermeye , gemilerin satışıyla ilgili gemilergetişıgın gerçekleştirmeye, gemileri hukuken ve teslim etmeye , gemilerin satışları ile ilgili resmî, kurumlarda işlemler yapmaya , işlemleri takibe , sonuçlandırmaya ,bayanlarda bulunmaya ve imza sirkülerinin noterlegmesin vermeye, gerekli bütün evrakları imzalamaya ve tüm diğer işlemleri yapmaya ayrı müvekkilerden ayrı bitek olarak Mehmet Kızı 16836097604 T.C Kimlik numarası Hatice Ünlü Karaağaç ve Mehmet oğlu, 1979 doğumlu, 26150106474 T.C Kimlik numarası SEMİH ÜNLÜ tarafından yetkili tayin edildi.

---

**KARTAL 1. NOTERİ**
AYLA KESİMAL
ŞERİFİ

22 NİSAN 20...
KARTAL 1.NOTERİ
...
...
NSS.NO: 2014K0002041-107- 0673441576

---

**KARTAL 1. NOTERİ**

Ayla KESİMAL
İmzaya Yetkili
Azra DÜNGELOĞLU

---

**KARTAL 12.NOTERİ**
SEDAT TOROS

**KARTAL 12. NOTERİ**
SEDAT TOROS
Başkatip
ERDAL KARATAŞ

No 17460

03 Haziran 2014

İngilizce'den Türkçe'ye tercüme edilmiştir

№ 17 458

TASDİK OLARAK Şirket bu vekaletnameyi 20 Mayıs 2014 tarihinde düzenlemiştir.

(İmza)

Şirket Kaşesi
NEXUS MARITIME SERVICES GMBH

CHRISTOFOROS KONTRAROS
Yönetim Kurulu Başkanı / Sekreter / Sayman / Tek Müdür

03 Haziran 2014

KARTAL 12. NOTERİ T.C.
SEDAT TOROS Vekili
Başkatip
ERDAL KARATAŞ

BİLGİN TERCÜMANLIK
YAYINCILIK VE TURİZM ...
Yeminli Tercüman
Mehmet ÇALAK

İngilizce'den Tür...

№ 17 460

14. Yukarıda belirtilen her hangi bir hususla veya bunlarla ilgili olarak her türlü şalısla ortaya çıkabilecek görüş farklılığı veya uzlaşmazlık halinde keyfiyet bütünüyle kendisinde olmak üzere vekilin uygun göreceği şekilde uzlaşmazlığı tahkime veya üst hakeme havale etmek, şirkete ödenecek her türlü borç veya tutarın tamamen ödenmesi için uzlaşma yapmak ve ödeme konusunda teminatlı veya teminatsız olarak süre uzatımı vermek ve tuzlandıracak işlerinde bulunmak.

15. Burada belirtilen amaçlar için avukat olmak ve genelde şirket adına işlemleri başlatmak, başvuruda bulunmak, dava veya yasal yol açısından uzlaşma veya davayı geri alma ve belge ekleme konusunda tam yetkili olarak davacı, davalı veya üçüncü taraf sıfatıyla davaları yürütmek.

16. Burada verilen yetkilerle her türlü işlemi yapmak.

17. Şirketin işlerini her açıdan yürütmek ve idare etmek ve şirket için gerekebilecek her türlü işlemi tam olarak ve etkili bir şekilde yapmak.

18. Şirket adına bu vekaletnameyi veya kopyalarını kabul etmek ve genelde bu yetkilerin kullanılması gerekebilecek dünyanın bütün ülkelerinde yasalara göre bu vekaletnamenin kullanılması ve yürürlüğe girmesi için gerekebilecek her türlü işlemi yapmak.

19. Burada belirtilen amaçlar için kendisi altında vekil veya vekiller atamak veya azletmek.

ŞİRKET vekil veya vekillerin bu vekaletname ile yasal olarak yapacağı veya yaptıracağı her türlü işlemi işburada onaylar ve tasdik eder. Vekaletnameyi iptal yazısı vekil tarafından alınıncaya kadar BU VEKALETNAME yürürlükte kalacak ve bu tür iptal yazısı üçüncü taraflarca alınıncaya şirket üzerinde bağlayıcı olmaya devam edecek ve üçüncü taraflar lehine olmayı sürdürecektir.

BİLGİN TERCÜMANLIK
YAYINCILIK VE TURİZM ...
Yeminli Tercüman
Mehmet ÇALAK

№ 17461



| | Horse power of engines (if any) |
|---|---|
| (a) steam or ship | 10550 BHP |

| Number of Tons | |
|---|---|
| Gross | Net |
| 13867 | 4160 |

... Asagi Kordonboyu Mah., Ankara Cad. No:85 ...adredfiftythousand) paid to us by (b) NEXUS ... whereof is hereby acknowledged, transfer ...all

assigns, that we have power to ... from encumbrances (d) any and all



(a) Where the ship is FULLY or IN Body Corporation. (b) Insert name and address in full, and description ... not or their
rights, there be any subsisting Mortgage or outstanding Certificate of Mortgage or Sale, add "save as appears by the Registry of the said Ship"
NOTE. — Every owner of a registered British vessel lines not obtain a complete title until the Bill of Sale has been recorded in the Port of Registry of the ship. If a mortgage of the ship ... appears ... the ship ...
NOTE. — ... Debts or mortgages are recorded in the importance of keeping the Registrar of British Ships informed of any change of residence or change ...
Sec. F. 20S8 (Aug 1978)

APOSTILLE

( Convention de La Haye du 5 Octobre 1961 )

1. Ülke/Country/Pays/Staat TÜRKİYE - LA TURQUIE
İşbu resmi belge/This public document/Le présent acte public/Dieses zeugnis wurde

2. Erdal KARATAŞ tarafından imzalanmıştır./Has been signed by/a été signé par/durch ... unterschrieben

3. İmzalayanın sıfatı BAŞKATİP'dir./Acting in the capacity of/Agissant en qualité de/Titel des Unterzeichneten

4. Kartal 12.Noterliği'nin mühür/damgasını taşımaktadır/bears the seal/stamp of/est revêtu du sceau/timbre de-trägt Siegel/Stempel von

TASDİK / CERTIFIED / ATTESTE / BEGLAUBIGUNG:

5. Tuzla Kaymakamlığı'da/at/in

6. 4.6.2014 günü/the/le/Am

7. Yazı İşleri Müdürü Seyhan ATCI tarafından/by/par/durch den/die

8. No: 869 ile tasdik edilmiştir./No:/sous No:/unter Nr.

9. Mühür - Damga/Seal-stamp/Sceau-timbre/Siegel-Stempel

10. İmza/Signature/Signature/Unterschrift:

..............

T.C. KARTAL 12. NOTERİ
SEDAT TOROS

KARTAL 12. NOTERİ
SEDAT TOROS
Başkatip
ERDAL KARATAŞ

BİLGİN TERCÜMANLIK
YATIRIMCILIK VE TURİZM LTD. ŞTİ.
Yanışça Mh. Yalıköy Cd. No: 33-
Postane Mh. Yalıköy Cd. No: 33-
Tuzla VD. 174.004.2
Tuzla / İST.
Ticaret Sicil No 21547

Sworn Translator
Yeminli Tercüman
Mehmet ÇATAK



# NEXUS MARITIME SERVICES GmbH

To    : PIRAEUS BANK
       Piraeus Branch (ex. Bank of Cyprus)
From  : Christopher Kontraros
       c/o Nexus Maritime Services GmbH
Tel.   : +30 6947 798746

May   , 2014

**SUBJECT: <u>CURRENCY CONVERSION</u>**

Kindly effect upon incoming fund arrival, the sale from bank account number (34494793) 6552 108772 012 of Nexus Maritime Services GmbH in EUR and place corresponding amount in the company's account number (34494775) 6552 108772 004, amount equivalent to cover the transfer of 9,720,000.00 USD as per given payment instruction.

Thank you in advance for your cooperation.

Sincerely yours

Christopher Kontraros

**PIRAEUS BANK S.A.**
4, Amerikis str. - 10564
ATHENS - GREECE
TPIN 094014298
TAX OFFICE FOR LARGE ENTERPRISES

# ΠΑΡΕΛΗΦΘΗ
ΩΡΑ:..14:10..............
ΗΜ/ΝΙΑ:..21/05/2014..
**ΤΡΑΠΕΖΑ ΠΕΙΡΑΙΩΣ Α.Ε.**
ΚΑΤ/ΜΑ ΠΕΙΡΑΙΑ (1552)

Καπνίσης Ιωάννης

**EXHIBIT
6**



# NEXUS MARITIME SERVICES GmbH

To          : PIRAEUS BANK
              Piraeus Branch
Attn        : Mr. Kapnisis
From        : Christopher Kontraros
Tel.        : +30 6947 798746

May 21. 2014

**SUBJECT: IRREVOCABLE TRANSFER ORDER**

Kindly effect upon arrival of corresponding funds. the following payment on behalf of NEXUS MARITIME SERVICES GmbH, from the USD Account: 6552 108772 012 (ex. 34494793), **Net of all Charges** to:

| | |
|---|---|
| **Beneficiary Bank:** | **GARANTI BANKASI** |
| **Branch Name:** | **KARTAL/ISTANBUL** |
| **Branch code:** | **091** |
| **S.W.I.F.T.:** | **TGBATRISXXX** |
| **Account No.:** | **TR72 0006 2000 0910 0009 0871 91** |

| | |
|---|---|
| **Beneficiary Customer:** | **SUMARINE DENIZCILIK A.S** |
| **Corres.Bank:** | **Bank of New York** |
| **Corr. Bank Swift:** | **IRVTUS3NXXX** |

| | |
|---|---|
| **Reference:** | **Balance payment of purchase price for 2 ropax vessels (SU1, ex. ULUSOY 1 and SU2, ex. ULUSOY 2)** |
| **Amount:** | **US Dollars 9,720,000.00 ($NineMillionSevenHundredTwentyS)** |

Further kindly send the payment confirmation (SWIFT) by email to nexusgmbh@gmail.com, immediately once payment has been effected.

Waiting for your soonest.

Sincerely yours

Christopher Kontraros

**PIRAEUS BANK S.A.**
4, Amerikis str. - 10564
ATHENS - GREECE
TPIN 094014298
TAX OFFICE FOR LARGE ENTERPRISES

**ΠΑΡΕΛΗΦΘΗ**
ΩΡΑ:...18:10...........................
HM/NIA:..21/05/2014.............
**ΤΡΑΠΕΖΑ ΠΕΙΡΑΙΩΣ Α.Ε.**
ΚΑΤ/ΜΑ ΠΕΙΡΑΙΑ (1552)

Κάνισης Ιωάννης

# PETITION

I hereby request you to run a check and to arraign RF citizens V. Shumilin and V.I. Revunkov on a criminal charge, who within the period from early May 2014 until June 2014 by fraud, offering to arrange a shipping and cargo shipping company in Russia, stole funds in the amount of USD 12,3 million owned by SVM Holdings SA (Switzerland).

Citizens V. Shumilin and V.I. Revunkov, purporting to misappropriate above-said amount of money, deceived representatives of SVM Holdings SA into executing the Loan Agreement and Addendum № 1 thereto totaling USD 12,3 million, having promised to use the monies borrowed for purchasing two Roll on - Roll of Cargo/Passenger Ships from the parties familiar to them in order to register ownership to said ships in the name of SVM Holdings SA for further use thereof for cargo shipment in Russia.

Upon instructions of V. Shumilin and V.I. Revunkov the funds were transferred by SVM Holdings SA to the bank account of the foreign company NEXUS MARITIME SERVICES owned by them in two installments: on 16 May, 2014 an amount equal to USD 1,5 million was transferred and on 30 May, 2014 an amount equal to USD 10,8 million was transferred. Receipt of funds is not contested by V. Shumilin and V.I. Revunkov.

According to the information available to us, V. Shumilin and V.I. Revunkov used the funds received from SVM Holdings SA to acquire two vessels: "Novorossiysk" and "Sevastopol", which presumptuously are currently making freight voyages along the route between Novorossiysk and Kerch. Simultaneously, in spite of their covenants and promises, they flatly refused to register said vessels under the ownership SVM Holdings SA, and they also refused to return the funds received from SVM Holdings SA for acquisition of the vessels.

After receipt of the funds from SVM Holdings SA and acquisition of the vessels, V. Shumilin and V.I. Revunkov have completely suspended any communication with representatives of SVM Holdings SA, and are making efforts to oppose recovery of stolen money from them.

There is the risk that V. Shumilin and V.I. Revunkov will undertake efforts for concealment of the "Novorossiysk" and "Sevastopol" ships purchased for the monies stolen from SVM Holdings SA through subsequent technical "sale" or "transfer" thereof under non-market terms and conditions to their relatives or friends or otherwise.

In view of the foregoing, given that unlawful fraudulent actions of V. Shumilin and V.I. Revunkov inflicted grand pecuniary loss,

I hereby request

1. To institute criminal proceedings against V. Shumilin and V.I. Revunkov over a crime of theft of the company's funds;

**EXHIBIT**

**7**

2. To arrest the vessels "Novorossiysk" and "Sevastopol" in order to prevent concealment of property acquired for the monies stolen from SVM Holdings SA;

In confirmation of above-listed facts and circumstances I attached hereto relevant documents and correspondence between the parties as per list.

I have been warned of criminal liability for providing knowingly false opinion, as stipulated by Article 306 of the Criminal Code of the Russian Federation.


/signature/

A.V. Konkov
Representative of SVM Holdings SA (by proxy)


27 July, 2015

*Настоящий перевод с русского языка на английский язык выполнен дипломированным переводчиком* *This document has been translated from Russian into English by certified translator*

*Фадеевой Еленой Сергеевной/Fadeeva Elena Sergeevna*

Город Москва, первого сентября две тысячи пятнадцатого года.

Я, **Старикова Екатерина Владимировна**, нотариус города Москвы, свидетельствую подлинность подписи, сделанной переводчиком **Фадеевой Еленой Сергеевной** в моём присутствии. Личность её установлена.

Зарегистрировано в реестре за № *1 - 10131*
Взыскано по тарифу 500 рублей.
Нотариус:



Всего прошнуровано,
пронумеровано и скреплено
печатью _____ листов
Нотариус

Начальнику УЭБиПК ГУ МВД по г. Москве
Генерал-майору полиции
Солопову С.А.

**ЗАЯВЛЕНИЕ**

Прошу Вас провести проверку и привлечь к уголовной ответственности граждан РФ Шумилина В. и Ревункова В.И, которые в период с начала мая 2014 г. по июнь 2014 г. путем обмана, сопряженного с предложением организации судовладельческой и грузо-перевозочной компании в России, похитили принадлежащие компании СВМ Холдингз С.А. (Швейцария) денежные средства в размере 12,3 млн. долларов США.

Граждане Шумилин В. и Ревунков В.И., имея целью присвоить себе вышеуказанную сумму, введя в заблуждение представителей компании СВМ Холдингз С.А., обманным путем вынудили их подписать Договор Займа и Приложение № 1 к нему на общую сумму 12,3 млн. долларов США, пообещав на заемные деньги приобрести два грузо-перевозочных судна типа "Ро-Ро" у знакомых им лиц для того, чтобы затем оформить право собственности на эти суда на компанию СВМ Холдингз С.А. для их последующего использования в целях перевозки грузов на территории России.

По указанию Шумилина В. и Ревункова В.И., денежные средства были перечислены СВМ Холдингз С.А. на банковский счет принадлежащей им иностранной компании Нексус Маритайм Сервисиз двумя траншами: "16" мая 2014 г. была перечислена сумма в размере 1,5 млн. долларов США и "30" мая 2014 г. была перечислена сумма в размере 10,8 млн. долларов США. Получение денежных средств не оспаривается Шумилиным и Ревунковым.

По имеющейся у нас информации, граждане Шумилин и Ревунков на полученные от СВМ Холдингз С.А. денежные средства приобрели два судна "Новороссийск" и "Севастополь", которые, предположительно, в настоящий момент совершают грузо-перевозочные рейсы по маршруту г. Новороссийск - г. Керчь. Одновременно с этим, несмотря на свои заверения и обещания, они категорически отказались оформить данные суда в собственность компании СВМ Холдингз С.А. и, при этом, также отказались возвращать денежные средства, полученные на приобретение судов от компании СВМ Холдингз С.А.

После получения денежных средств от компании СВМ Холдингз С.А. и приобретения судов граждане Шумилин и Ревунков полностью прекратили общение с представителями компании СВМ Холдингз С.А. и предпринимают действия по противодействию взыскания с них похищенных денежных средств.

Существует опасение того, что граждане Шумилин и Ревунков предпримут действия по сокрытию приобретенных на похищенные у компании СВМ Холдингз С.А. денежные средства судов "Новороссийск" и "Севастополь" путем их последующей технической "продажи" или "передачи" на не рыночных условиях своим родственникам или друзьям или каким-либо иным образом.

Учитывая изложенное, принимая во внимание, что незаконными обманными действиями Ревункова и Шумилина компании причинен имущественный ущерб в особо крупном размере

Прошу

1. Возбудить в отношении Ревункова и Шумилина уголовное дело по факту хищения денежных средств компании

2. Наложить арест на судна Новороссийск и Севастополь для предотвращения сокрытия имущества, приобретенного на похищенные у компании СВМ Холдингз С.А. денежные средства.

В подтверждении всех указанных выше фактов и обстоятельств, к настоящему Заявлению прилагаются соответствующие документы и переписка между сторонами согласно перечню.

Об уголовной ответственности за сообщение заведомо ложных сведений согласно статье 306 Уголовного Кодекса РФ предупрежден.

Коньков А.В.
Представитель компании СВМ Холдингз С.А. (по доверенности)

27.07.2015 г.

# THE REPUBLIC OF LIBERIA



# APOSTILLE

(Hague Convention of 5 October 1961/Convention de La Haye du 5 Octobre 1961)

1. Country:      The Republic of Liberia

**This Public Document**

2. Has been signed by:      Sofiana Kontouri

3. Acting in the capacity of:      Special Agent,
Liberia Maritime Authority

4. Bears the seal/stamp of:      Liberia Maritime Authority

**Certified**

5. At:      Piraeus, Greece

6. On:      May 21, 2014

7. By:      I. PAPOUTSOGLOU
Special Agent,
Liberia Maritime Authority

8. Number:      G-86463

9. Seal/Stamp:

10. Signature:



C-114318-1064353

1

EXHIBIT
8
tabbies

# GENERAL POWER OF ATTORNEY

KNOW ALL MEN BY THESE PRESENTS that "NEXUS MARITIME SERVICES GMBH", a Company duly organised, operating and existing under and pursuant to the Laws of the Republic of Liberia, having its registered office at 80 Broad street, Monrovia, Republic of Liberia (hereinafter called "the Company") DOES HEREBY MAKE, MOMINATE, CONSTITUTE, APPOINT AND EMPOWER Mr. VALERII REVUNKOV, born on 10.7.1951, bearer of the Russian passport Nr. 728521961, issued on 11.4.2014 and expiring on 11.4.2024 (hereinafter called "the Attorney") to be its true and lawful Attorney and Attorney-in-fact in all countries of the world and to act for the Company and on its behalf and in its name, place and stead to do all or any of the following acts, deeds, matters and things:

1. To open with any bank or banks in the world current and/or deposit and/or any other account or accounts whatsoever, to operate same by his signature and to close same, all in his absolute discretion. To sign, issue, draw, make and/or endorse every and any cheque or cheques, order(s) for the payment of money, bill(s) of exchange and/or note or notes in which the Company may be interested or concerned, in his absolute discretion. Furthermore in the name of the Company to lend, borrow and/or draw upon any bank(s), individual(s), firms(s), corporation(s) and/or company or companies for any sum or sums of money. In doing all the aforementioned to sign any mandates, forms and/or any other documents whatsoever in his absolute discretion.

2. To invest any of the Company's monies in such securities and at such rate of interest and to vary such securities as the Attorney may think fit at his absolute discretion.

3. To demand, recover and receive from all and every or any person or persons, firms, companies and corporations whatsoever all and every sum or sums of monies, goods, chattels, shares, securities, effects and things whatsoever which now is or are or which shall or may hereafter appear to be due, owing, payable or belonging to the Company or in respect of any principal money and interest now or hereafter to become payable to the

1

Company upon or in respect of any mortgage, charge or other security or for interests or dividends to accrue or become payable to the Company for or in respect of any shares, stock, debentures or interest which the Company may now or hereafter hold in any joint stock or incorporated company or companies or for any monies or securities for money which are now or hereafter may be due, owing or belonging to the Company upon any bond, note, cheque, bill or bills of exchange, balance of account current, consignment, contract, decree, judgment, order or execution or upon any other account.

4. To negotiate and contract for the purchase of and to purchase any property, chattel and/or vessel or any properties, chattels and/or vessels or share or shares therein in which the Company may be or become interested on such terms and conditions as the Attorney shall think fit and likewise, to mortgage and accept loans on any property, chattel and/or vessel or any properties, chattels and/or vessels or share or shares therein belonging to the Company or which the Company may hereafter acquire on such terms and conditions as the Attorney may in his absolute discretion consider appropriate including a mortgage as hereinabove to the Attorney himself as he may deem fit and to make any deduction in purchase price for any defect in any such properties, chattels and/or vessels.

5. To sell any property, chattel and/or vessel or any properties, chattels and/or vessels or share or shares therein belonging to the Company or which the Company may hereafter acquire on such terms and at such price including a nominal price as the Attorney may think fit in his absolute discretion including a sale as hereinabove to the Attorney himself as he may deem fit and upon such sale to collect the sale price or receive the deposit and the balance of the same or part thereof according to the terms of the sale and to give a good and sufficient receipt for the same and to represent the Company legally in all matters concerning the sale or purchase of any property, chattel and/or vessel or any properties, chattels and/or vessels.

6. To advance money or mortgage or to charter, let to freight, hire, manage and operate any property, chattel and/or vessel or any properties, chattels and/or vessels and to effect insurance on the same or on the income, rent freight or goods thereof. To register any vessel or vessels under the flag of

2

any country and to transfer the ownership of same and to apply for the registration, provisional or permanent, under the flag of any country, the transfer of registry and flag and closure of registry of any vessel or vessels or registration or cancellation or registration of any mortgage thereon.

7. To buy and sell goods of all kind for cash or on credit and to carry out and contract for repairs and improvements of real and personal property in the name and on behalf of the Company.

8. To effect, maintain and recover under insurances against loss, damage and liability.

9. To give, vary and revoke instructions as to the manner in which any monies payable to or by the Company (whether periodically or otherwise) shall be paid or dealt with and as to the custody, and disposal of any personal property including securities and documents of title.

10. To engage, remunerate, dismiss and fix and vary the duties and terms of service of employees.

11. To act for the Company and in its name, place and stead, to appear at any meeting of the Board of Directors of any Company or corporation of which the Company may be a Director for whatever purpose such meeting may be held and to vote for the Company and in its name, place and stead at such meetings as a Director of such company or corporation, casting of the Attorney's vote at such meetings on its behalf to be in his sole and absolute discretion, and to act for the Company and to do everything which is or may be within its power and competence as a Director of such company or corporation provided that the delegation of the powers of a Director is lawful and valid in accordance with the laws governing such company or corporation as aforesaid.

12. To take delivery of or withdraw from any Post Office any postal letter or parcel whether registered or insured or otherwise.

13. For all or any of the purposes herein mentioned to appear before, make applications to any authority, sign, seal, execute, deliver and acknowledge any and all documents necessary of whatsoever kind and nature and to make declarations and affidavits.

14. In case of difference or dispute with any person or persons concerning any of the matters aforesaid or any other matters that may arise in connection therewith, to submit any such difference or dispute to arbitration or umpirage in such manner as the Attorney shall think fit in his absolute discretion and to compound, compromise and accept part in satisfaction for the payment of the whole of any debt or sum of money payable to the Company or to grant any extension of time for the payment of the same either with or without taking security and otherwise to act in respect of the same as to the Attorney shall appear more expedient.

15. To appoint Attorneys-at-Law to do any of the purposes herein and generally to initiate on behalf of the Company any actions, submit applications, conduct cases, whether as Plaintiffs, Defendants, third parties or otherwise with full power to compromise or withdraw actions and legal remedies and to attach documents as false.

16. To concur in doing any act or thing hereby authorised.

17. To carry on, manage and conduct the Company's business in every respect and to act and transact all other things which may be necessary or requisite in the premises for the Company as fully, amply and effectually as if the Attorney was personally acting and did the same.

18. To acknowledge in the name of the Company this Power of Attorney or any copy or copies thereof and generally to do any act, deed, matter and thing whatsoever which may be in anywise requisite or proper for authenticating and giving full effect to this Power of Attorney according to the laws and usages of any country in the world in which the powers hereby given may require to be used.

19. To nominate and appoint one or more substitute or substitutes attorney or attorneys under him for all of the purposes aforesaid and the same at pleasure to revoke.

**AND THE COMPANY** hereby ratifies and approves all that the Attorney and his substitutes may do or cause to be done lawfully by virtue hereof.

**THIS POWER OF ATTORNEY** shall remain in force until notice of its revocation has been received by the Attorney but shall at all times remain in

4

force and will be conclusively binding upon the Company towards and in favour of third parties until such notice of revocation has also been received by them.

**IN WITNESS WHEREOF** the Company has executed this Power of Attorney this 20th day of May, 2014.

**THE COMMON SEAL of**     )
**NEXUS MARITIME SERVICES GMBH** )
**was hereunto affixed**     )
          )   **CHRISTOFOROS KONTRAROS**
          )   **President/Secretary/Treasurer**
          )        **Sole Director**

The foregoing instrument, subscribed and sworn to this 20th day of May, 2014 bears the signature of **KONTRAROS CHRISTOFOROS** having Identification Card Number AI 628066 issued by GREECE on 08 SEP 2010 known to me to be the individual described in and who executed the foregoing instrument and who duly acknowledged that the execution thereof was his act and deed and the act and deed of **NEXUS MARITIME SERVICES GMBH**, a Liberian corporation. Legalized on this 21st day of May, 2014.

Sofiana Konteh
Special Agent
Liberia Maritime Authority

# THE REPUBLIC OF LIBERIA



# APOSTILLE

(Hague Convention of 5 October 1961/Convention de La Haye du 5 Octobre 1961)

1. Country:                      The Republic of Liberia

**This Public Document**

2. Has been signed by:          Sofiana Kontouri

3. Acting in the capacity of:      Special Agent,
Liberia Maritime Authority

4. Bears the seal/stamp of:       Liberia Maritime Authority

**Certified**

5. At:                           Piraeus, Greece

6. On:                          June 03, 2014

7. By:                           I. PAPOUTSOGLOU
Special Agent,
Liberia Maritime Authority

8. Number:                  G-86824

9. Seal/Stamp:

10. Signature:



C-114318-1064736

EXHIBIT
9
tabbies

## "NEXUS MARITIME SERVICES GMBH"

### MINUTES OF THE RESOLUTIONS OF
### THE SOLE DIRECTOR OF THE COMPANY
### ADOPTED ON THE 2ND DAY OF JUNE 2014 AT 11.00 A.M.

**CHRISTOFOROS KONTRAROS** — Sole Director
President/Secretary/Treasurer

The following Resolutions are hereby adopted:

A. The Corporation will issue its authorized registered shares of Five Hundred (500) to the individual mentioned hereinbelow.

B. The relevant Stock Certificates will be signed and sealed with the corporate seal by the Sole Director of the Corporation.

C. All the capital stock of the Corporation, i.e. all its Five Hundred (500) registered shares without par value will be handed over to **Mr. VLADIMIR SHUMILIN, holder of the Russian Federation passport No. 64 No. 0337735, issued on 17.12.2009, as follows:**

**Certificates No.1-2 for One Hundred (100) Shares' value each**
**Certificates No. 3-6 for Fifty (50) Shares' value each**
**Certificates No. 7-8 for Twenty Five (25) Shares' value each**
**Certificate No. 9 for Twenty (20) Shares' value**
**Certificates No.10-12 for Ten (10) Shares' value each**

**Total amount of Registered Shares received by Mr. VLADIMIR SHUMILIN, Five Hundred (500) i.e. all the capital stock.**

The corporate seal of the Corporation is hereto affixed and these Minutes are signed as follows:

**CHRISTOFOROS KONTRAROS**
**Sole Director**
**President/Secretary/Treasurer**

The foregoing instrument, subscribed and sworn to this 2nd day of June, 2014 bears the signature of **KONTRAROS CHRISTOFOROS** having Identification Card Number AI 628066 issued by GREECE on 08 SEP 2010 known to me to be the individual described in and who executed the foregoing instrument and who duly acknowledged that the execution thereof was his act and deed and the act and deed of **NEXUS MARITIME SERVICES GMBH**, a Liberian corporation. Legalized on this 3rd day of June, 2014.

Sofiana Kontouri
Special Agent
Liberia Maritime Authority

# PROCEDURAL ORDER NO. 1

including

# PRELIMINARY ORDER ON APPLICATION FOR EMERGENCY RELIEF

In the matter of an emergency relief arbitration conducted under
the Swiss Rules of International Arbitration (June 2012) and, in particular,
the provisions on emergency relief (Article 43)

between

SVM HOLDING S.A., 151, avenue de la Faiencerie, L-1511 Luxembourg

- **Applicant** -

represented by Mr Pierre Turrettini and Mr David Cuendet, Attorneys at law, BOREL &
BARBEY, 2, rue de Jargonnant, P.O. Box 6045, 1211 Geneva 6, Switzerland

and

NEXUS MARITIME SERVICES GMBH, 36, Amfiktionion Str., 15236 Nea Penteli, Athens, Greece

- **Respondent 1** -

MR VLADIMIR SHUMILIN, Ardzhenikidze Str. 26, App. 6, 354000 Sochi, Russian Federation

- **Respondent 2** -

Before the Emergency Arbitrator:

Dr Diana Akikol

19 August 2015



## I.    Introduction

1.    This is a first procedural order (the "**Procedural Order No. 1**" or the "**Order**") issued in emergency relief proceedings conducted under Chapter 12 of the Swiss Private International Law Act dated 18 December 1987 (the "**PILA**") in conjunction with the Swiss Rules of International Arbitration in force as of 1 June 2012 (the "**Swiss Rules**") and, in particular, the provisions on emergency relief (Article 43 of the Swiss Rules).

2.    Since the Applicant seeks a decision on its request for urgent interim relief before the Respondents are heard, the Emergency Arbitrator will examine the request in question on a *prima facie* basis, taking into account the elements and evidence adduced with the application for emergency relief, and issue a decision by way of a preliminary order (the "**Preliminary Order**"), pursuant to Article 43(1) *cum* Article 26(3) of the Swiss Rules. The final decision on the application for emergency relief pursuant to Article 43(7) of the Swiss Rules will be made once the Respondents had an opportunity to be heard.

3.    In view of the urgency inherent in these proceedings, the reasons underlying the Preliminary Order are given only in summary form (see *mutatis mutandis* Article 42(1)(e) of the Swiss Rules).

## II.    Parties and Emergency Arbitrator

4.    The parties to these proceedings are collectively referred to as the "**Parties**" and individually as a "**Party**".

### A.    Applicant

5.    The Applicant is SVM HOLDING S.A. (the "**Applicant**" or "**SVM**"), a company incorporated under the laws of Luxembourg having its registered office at:

151, avenue de la Faiencerie
1511 Luxembourg
Luxembourg

Phone:  +41 22 707 18 11
Fax:    +41 22 707 18 11

6.  The Applicant is represented in these proceedings by:

Mr Pierre Turrettini
Mr David Cuendet
Attorneys at law
BOREL & BARBEY
2, rue de Jargonnant
P.O. Box 6045
1211 Geneva 6
Switzerland

Phone:  +41 22 707 18 00
Fax:    +41 22 707 18 11

Email:  pierre.turrettini@borel-barbey.ch
        david.cuendet@borel-barbey.ch

**B.   Respondent 1**

7.  The Respondent 1 is NEXUS MARITIME SERVICES GMBH (the "**Respond-
    ent 1**" or "**Nexus**"), a company incorporated under the laws of Greece

    having its registered office at:[1]

    36, Amfiktionion tr.
    15236 Nea Penteli
    Athens, Greece
    Email: nexusgmbh@googlemail.com

    and a postal address at:[2]

    26, Anoixeos Str.
    14568 Krioneri
    Attica Greece

---

[1]   Application, para 2 and 14; Exh. C-3.
[2]   Exh. C-3.

8. The Respondent 1 is a Liberian non-resident entity having the following address according to Liberian rules:[3]

Nexus Maritime Services GmbH
80 Broad Street, Monrovia
Liberia

### C. Respondent 2

9. The Respondent 2 is Mr Vladimir Shumilin (the "**Respondent 2**" or "**Mr Shumilin**"), a Russian citizen having his address at:[4]

Ardzhenikidze Str. 26, App. 6
354000 Sochi
Russian Federation

### D. Emergency Arbitrator

10. The Emergency Arbitrator in these proceedings is:

Dr Diana Akikol
Akikol, Beguin & Richa LLC
Rue de Beaumont 11
1206 Geneva
Switzerland
Phone: +41 22 703 51 00
Fax: +41 22 703 51 01

E-mail: diana.akikol@abrlegal.ch

## III. Arbitration Agreement

11. The Applicant invokes an arbitration clause (the "**Arbitration Agreement**") contained in Article 5.2 (at para 24) of a loan agreement dated 16 May 2014 (the "**Loan Agreement**", Exh. C-3).

---

[3] Application, para 2 and 13-14; Exh. C-2, C-4.

[4] Application, para 15-16.

12.   The Arbitration Agreement reads as follows:

> "*Any dispute, controversy or claim arising out of or in relation to this Agreement, including the validity, invalidity, breach or termination thereof, shall be settled by arbitration in accordance with the Swiss Rules of International Arbitration of the Swiss Chambers of Commerce in force on the date when the Notice of Arbitration is submitted in accordance with these Rules. The number of arbitrators shall be one. The seat of the arbitration shall be Geneva. The arbitral proceedings shall be conducted in English.*"

13.   Accordingly, these emergency relief proceedings shall be administered by the Swiss Chambers' Arbitration Institution (the "**SCAI**") through its bodies, i.e. the Arbitration Court (the "**Court**") and the Secretariat of the Court (the "**Secretariat**"), in accordance with the Swiss Rules currently in force (version in force as of 1 June 2012).

## IV.   Seat and Language of the Emergency Arbitration

14.   In accordance with the Arbitration Agreement, the seat of the emergency arbitration is Geneva, Switzerland, and the language of the emergency arbitration is English.

## V.   Applicable Law

### A.   Procedural Rules

15.   The following procedural rules shall apply to these proceedings (in the order as indicated herein):

(a)   the provisions of Chapter 12 (Arbitration) of the PILA, subject to any derogation from non-mandatory provisions pursuant to the rules set forth in (b) or (c), below;

(b)   the Swiss Rules referred to in the Arbitration Agreement, in particular Article 43 in conjunction with Article 26, subject to any derogation

from non-mandatory provisions pursuant to the rules set forth in (c), below; and

(c)     the specific procedural rules and further procedural directions which the Emergency Arbitrator may issue in these proceedings, if possible after consultation with the Parties.

## B.     Substantive Law

16.     Pursuant to its Article 5.1 (at para 23), the Loan Agreement is governed by Swiss law (Exh. C-3).

## VI.     Proceedings Outlined

17.     SVM initiated these proceedings with an application for emergency relief pursuant to Article 43 of the Swiss Rules (the "**Application**"), including already its notice of arbitration (the "**NoA**"), filed together with its Exhibits C-1 to C-22 on Thursday, 13 August 2015 (date of receipt by the SCAI). The non-refundable Registration Fee of CHF 4,500 and deposit of CHF 20,000 required under Section 1.6 of Annex B (Schedule of Costs) of the Swiss Rules were paid on the same day.

18.     By a letter dated 17 August 2015, the Secretariat informed SVM that the Court had appointed Dr Diana Akikol as Emergency Arbitrator. A copy of Dr Akikol's Consent to Appointment and Statement of Independence, as well as her *curriculum vitae* sent to the Secretariat by an email and letter dated 14 August 2015 was enclosed.

19.     The Emergency Arbitrator received the complete file on 18 August 2015, at 14:15. This Order is made on 19 August 2015 at 10:15.

## VII.     SVM's Request for Interim Measures

20.     With its Application, SVM seeks the following interim relief:

"*VII. RELIEFS SOUGHT BY CLAIMANT (art. 3.3 (f)
and 43.1 (a) Swiss Rules)*

*The Claimant requests the Arbitral Tribunal to order
that:*

*A. As to form*

*1. To admit this Application for Emergency Relief
Proceedings.*

*2. To admit this Request for Interim Measures of Pro-
tection.*

*3. To admit this Notice of Arbitration.*

*B. As to the urgent interim measures in an emer-
gency relief proceedings, without prior hearing of
Respondents*

*4. To order the freezing of the bank account of Nexus
at Piraeus Bank in Greece with an IBAN GR 06 0171
5520 0065 5210 8772 012.*

*5. To order the freezing of any other bank account of
Nexus at Piraeus Bank in Greece.*

*6. To order the freezing of any other bank account in
the name of Nexus or held by Nexus as beneficial
owner.*

*7. To order the freezing of any bank account in the
name of Mr Shumilin or held by Mr Shumilin as bene-
ficial owner.*

*8. To prohibit Nexus to dispose in any way of the
vessel currently named "Novorossiysk" built in 1980
and navigating under the Palau flag, IMO Ship Num-
ber 7822160.*

Procedural Order No. 1 | Preliminary Order

9. To prohibit Nexus to dispose in any way of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184.

10. To prohibit the Palau International Ship Registry to register any transfer of ownership of the vessel currently named "Novorossiysk" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160.

11. To prohibit the Palau International Ship Registry to register any transfer of ownership of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184.

12. To prohibit any ship registry where vessels are registered to register any transfer of the vessel currently named "Novorossiysk" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160.

13. To prohibit any ship registry where vessels are registered to register any transfer of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184.

14. To order the seizure of the vessel currently named "Novorossiysk" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160, at any port or place where it is anchored or aimed, upon the award and upon the execution thereof.

15. To order the seizure of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184, at any port or place where it is anchored or aimed, upon the award and upon the execution thereof.

*16. To confirm that the urgent interim measures shall immediately enter into force and be binding and shall be valid until the final award is adopted by the Arbitral Tribunal.*

*17. To debar Nexus and/or Mr Shumilin from making any other or contrary pleadings.*

*18. To reject any pleas contrary to SVM's own pleas.*

**C. As to the interim measures of protection in an interim relief proceedings**

**C.1. Principally**

*19. To confirm the urgent interim measures ordered in the emergency relief proceedings.*

*20. To debar Nexus and/or Mr Shumilin from making any other or contrary pleadings.*

*21. To reject any pleas contrary to SVM's own pleas.*

**C.2. Subsidiarily**

*22. To order the freezing of the bank account of Nexus at Piraeus Bank in Greece with an IBAN GR 06 0171 5520 0065 5210 8772 012.*

*23. To order the freezing of any other bank account of Nexus at Piraeus Bank in Greece.*

*24. To order the freezing of any other bank account in the name of Nexus or held by Nexus as beneficial owner.*

*25. To order the freezing of any bank account in the name of Mr Shumilin or held by Mr Shumilin as beneficial owner.*

26. *To prohibit Nexus to dispose in any way of the vessel currently named "Novorossiysk" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160.*

27. *To prohibit Nexus to dispose in any way of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184.*

28. *To prohibit the Palau International Ship Registry to register any transfer of ownership of the vessel currently named "Novorossiysk" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160.*

29. *To prohibit the Palau International Ship Registry to register any transfer of ownership of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184.*

30. *To prohibit any ship registry where vessels are registered to register any transfer of the vessel currently named "Novorossiysk" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160.*

31. *To prohibit any ship registry where vessels are registered to register any transfer of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184.*

32. *To order the seizure of the vessel currently named "Novorossiysk" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160, at any port or place where it is anchored or aimed, upon the award and upon the execution thereof.*

> *33. To order the seizure of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184, at any port or place where it is anchored or aimed, upon the award and upon the execution thereof.*

> *34. To confirm that the interim measures shall immediately enter into force and be binding and shall be valid until the final award is adopted by the Arbitral Tribunal.*

> *35. To debar Nexus and/or Mr Shumilin from making any other or contrary pleadings.*

> *36. To reject any pleas contrary to SVM's own pleas."*

21.     The Emergency Arbitrator understands that, with Prayers 4 to 18 submitted under the heading "*As to the urgent interim measures in an emergency relief proceedings, without prior hearing of Respondents*" (emphasis omitted), SVM seeks a Preliminary Order pursuant to Article 26(3) of the Swiss Rules from a Court-appointed emergency arbitrator.

22.     As to Prayers 19 to 36, entitled "*As to the interim measures of protection in an interim relief proceedings*", the question arises whether SVM intended to submit these Prayers to the Sole Arbitrator to be appointed in accordance with Article 7 of the Swiss Rules rather than to the Emergency Arbitrator. Be that as it may. It results from Article 26(3) *cum* Article 43(7) of the Swiss Rules that, once the Respondents had an opportunity to be heard, the Emergency Arbitrator shall examine whether the urgent interim measures (if any) granted by way of a Preliminary Order can be confirmed or need to be modified or withdrawn. It is indeed inherent in any preliminary order on interim relief that the court or tribunal which granted it must re-examine the matter after giving the opposing party an opportunity to be heard. Accordingly, the Emergency Arbitrator would be competent to decide on Prayers 19 to 36 even if they were meant to be submitted to the Sole Arbitrator. This is even more so as the Sole Arbitrator, after receipt of the file, may, in any event, modify, suspend or terminate any interim measure granted by the Emergency Arbitrator (Article 43(8) of the Swiss Rules).

## VIII. Analysis of the Request for a Preliminary Order

### A. Overview

23. Unless the parties have agreed otherwise, 183(1) of the PILA vests an arbitral tribunal with its seat in Switzerland with the power to grant interim measures at the request of a party.

24. For arbitrations conducted under the Swiss Rules, the arbitral tribunal's power to grant interim measures is confirmed in Article 26(1) of the Swiss Rules. In exceptional circumstances, Article 26(3) allows the arbitral tribunal to rule on a request for interim measures by way of a preliminary order before the other party is heard (so-called *ex parte* measures). Further, a party requiring urgent interim measures before the arbitral tribunal is constituted may apply for emergency relief proceedings under Article 43 of the Swiss Rules. In other words, the power to grant interim measures pursuant to Article 26, including, as the case may be, by way of a preliminary order pursuant to Article 26(3), has been extended to Court-appointed emergency arbitrators.

25. An application for emergency relief is admissible, if the parties have not agreed otherwise (Article 43(1) of the Swiss Rules). If the applicant seeks a preliminary order, or if the respondent has raised jurisdictional objections or does not participate in the proceedings, the emergency arbitrator must, in addition, be satisfied upon on a summary examination that a valid arbitration agreement exists between the parties and that the application relates to the dispute submitted to arbitration (*prima facie* jurisdiction). In accordance with the purpose of interim relief, which is to protect on a provisional basis the rights in dispute or the arbitral process, the arbitral tribunal may not grant measures for the protection of rights which are not the subject of the arbitration.

26. Arbitral tribunals, including emergency arbitrators, enjoy broad discretion when assessing the merits of a request for interim measures. Whilst the specific conditions for granting interim relief may depend on the type of measures sought, a request will typically be successful if the applicant credibly shows *(i)* a *prima facie* case on the merits (*fumus boni juris*) and

*(ii)* urgency (*periculum in mora*), meaning that the applicant must credibly show that it is likely to suffer irreparable harm, or at least harm not adequately reparable by an award of damages, if the requested relief is not granted immediately, and that such harm substantially outweighs the harm that is likely to result to the other party, if the measure is granted. In addition, the arbitral tribunal is entitled to order the provision of appropriate security.

27. Given the time constraints and the provisional nature of interim relief, the arbitral tribunal will normally conduct only a summary assessment of the facts and the rights and entitlements at issue.

28. If the conditions for granting interim measures are given, the arbitral tribunal must determine whether the requested measures are reasonable and proportionate in the light of all relevant circumstances, such as urgency, risk, potential harm to the other party, etc. The arbitral tribunal may, as the case may be, grant other (i.e. more appropriate) measures than those sought by the applicant.

29. It is widely accepted that arbitrators sitting under Chapter 12 of the PILA may order interim measures that are not available from Swiss state courts or unknown under Swiss law. Under Article 26(1) of the Swiss Rules, the arbitral tribunal may grant any interim measures it deems "*necessary or appropriate*".

30. However, the arbitral tribunal's power to grant interim measures is limited in several respects. For example, an arbitral tribunal lacks the power to enforce its order on interim relief against a party to the arbitration that does not voluntarily comply with the order. Moreover, the arbitral tribunal's power to order interim measures is limited to the parties bound by the arbitration agreement; since third parties are not bound by the arbitration agreement, which is the basis of any arbitral process, the arbitral tribunal may not order interim measures involving third parties (see also Article 26(2) of the UNICITRAL Arbitration Rules 2010: "*An interim measure is any temporary measure by which, at any time prior to the issuance of the award by which the dispute is finally decided, the arbitral tribunal **orders a party** [...] to: [...]*", emphasis added). Whilst arbitrators may order a party to provide a means of preserving assets out of which a subsequent award may be satisfied, it is widely accepted that the granting of an attachment

pursuant to Articles 271-281 of the Swiss Debt Enforcement and Bank-ruptcy Act of 1989 (the "**DEBA**") is the exclusive prerogative of the state courts.

## B.   Application to the Present Case

### 1.   Procedural Requirements

#### a)   Applicability of Article 43

31.   Since the Parties have not opted out of emergency relief proceedings un-der Article 43 of the Swiss Rules, the Application is admissible.

#### b)   Jurisdiction

32.   Since SVM seeks an order granting urgent interim measures before the Respondents are heard, the Emergency Arbitrator will examine *ex officio* whether she has jurisdiction to grant the requested relief (para 25, above).

33.   With its NoA, SVM has raised a number of claims against Nexus and/or Mr Shumilin on the basis of a loan agreement entered into between SVM as lender and Nexus as borrower on 16 May 2014 and amended on the same day (the "**Loan Agreement**", Exh. C-3 and C-6). In particular, SVM has asserted claims for payment of various amounts plus interest (Appli-cation, para 42).

34.   The Emergency Arbitrator is satisfied that Article 5.2 (at para 24) of the Loan Agreement *prima facie* contains a valid arbitration agreement refer-ring to the Swiss Rules currently in force. Since SVM's Application obvi-ously is intended to protect the various payment claims raised under this Loan Agreement, the Emergency Arbitrator's jurisdiction *ratione materiae* is given.

35.   As to jurisdiction *ratione personae*, it has already been stated that arbitra-tors, including emergency arbitrators, may not order interim measures in-volving third parties who are not bound by the arbitration agreement (para 30, above).

36.     Consequently, SVM's Prayers 4, 5, 6 and 7 cannot be granted, as they aim at the freezing of bank accounts held by Nexus or Mr Shumilin with banks that are not claimed to be parties to the Arbitration Agreement. The Emergency Arbitrator considers that she has no jurisdiction to grant interim relief to the extent that it might impact on third parties who are extraneous to the Arbitration Agreement, e.g. in form of an injunction that would require banks to prevent the removal of assets by the Respondents. At best, the Emergency Arbitrator could grant certain alternative measures, such as an order requiring Nexus to refrain from disposing of its assets on specific bank accounts up to a certain amount. Prayers 4-6, when interpreted in accordance with the rules of good faith, taking into account their broad wording and manifestly intended purpose, can be considered as including *in maiore minus* a request for such a freezing order which would be directed exclusively at Nexus as a party to the Arbitration Agreement (as to Prayer 7, see para 39-40). Whether such a freezing order is necessary or appropriate in the circumstances will be examined below (para 53-58). This being said, Prayer 6 must be dismissed for lack of substantiation, as it contains no indications as to the involved banks.

37.     In fact, the orders sought with Prayers 4-7 would amount to attachments of assets abroad, comparable to the interim measures provided for in Articles 271-281 of the DEBA, which the Emergency Arbitrator, in keeping with what seems to be a wide consensus, considers as being beyond the powers of arbitrators (see para 30, above). Since the requested Preliminary Order is a procedural order (not an interim award), it could, in any event, not be enforced abroad, as envisaged by SVM (Application, para 48(c)) and it therefore does not seem to be the appropriate means to protect the rights asserted by SVM in this arbitration. From a practical point of view, seeking the assistance of a competent state court, where available, may well be the better course, given that most courts have greater powers in relation to enforcement.

38.     The considerations under para 35-37 also apply to Prayers 14 and 15, whereby SVM seeks a decision ordering the seizure of the vessels Novorosssiysk and Sevastopol, respectively. Therefore, these Prayers must also be dismissed.

39.     With its Prayer 7, SVM seeks an order freezing any bank account in the name of Mr Shumilin or held by Mr Shumilin as beneficial owner. Apart

from the fact that this Prayer is not sufficiently substantiated, as it contains no indications as to the involved banks, it appears that the Loan Agreement was signed only by SVM and Nexus (Exh. C-2 and C-3; Application, para 2, 17). SVM explains that Mr Shumilin is also joined to ("*assigned in*") the arbitration, as SVM has serious concerns that Nexus was "*only a shell company used in order to avoid any civil and criminal liability of Mr Shumilin or even with the aim of defrauding* [SVM]" (Application, para 3, 52 *in fine*). It is in essence claimed that, under the circumstances described in the Application, Mr Shumilin is to be considered a party to the Loan Agreement and the Arbitration Agreement contained therein (see Application, para 37-52).

40. The Emergency Arbitrator notes that Article 178(1) of the PILA does not require the parties to sign an arbitration agreement; it is sufficient if it is evidenced by a text. But the evidence produced with the Application does not contain any text showing that Mr Shumilin agreed to become a party to the Arbitration Agreement in addition to Nexus. Whilst case law, under certain conditions, exceptionally allows an extension of the arbitration agreement to a third party, emergency relief proceedings are not the proper place to assess complex jurisdictional issues, as there is simply no time to assess properly the relevant facts and legal issues at stake. In the absence of clear written evidence of Mr Shumilin's consent to arbitration under the Swiss Rules, the Emergency Arbitrator therefore concludes that she lacks the power to order any measures directed against or involving Mr Shumilin. For these additional reasons, Prayer 7 cannot be granted.

41. Prayers 10, 11, 12 and 13 must also be dismissed, as the requested orders are directed against ship registries which manifestly are not bound by the Arbitration Agreement. Again, the Emergency Arbitrator could only issue an order prohibiting Nexus from disposing of its vessels, a measure that has been requested by SVM with its Prayers 8 and 9 and which will be addressed below (para 53-58).

## 2. Substantive Requirements

### a) *Prima facie* case

42. As stated, interim relief requires that the applicant has a *prima facie* case on the merits (para 26). The question is not whether the applicant actually

has a case; that decision is reserved for the award. At this stage, the relevant test simply is whether, based on the evidence adduced, the applicant has reasonable chances to succeed on the merits of the case, both in fact and at law, i.e. whether the applicant, with a reasonable degree of certainty, has a valid claim that may justify an order for interim measures. Whilst the burden of proof is on the applicant, a strict proof is not required. It is sufficient if the facts underlying the application are credibly shown. The legal assessment of such facts must, in principle, be conducted on the basis of the law applicable to the agreement in dispute (*lex causae*).

43.  The alleged claims that SVM seeks to protect by way of interim measures have been identified above (para 33). In essence, these claims are for reimbursement of a loan in the amount of USD 12,300,000, as well as for payment of accumulated interest amounting to USD 29,270.83 and USD 200,250 and of a penalty of USD 6,150, plus accrued interest on all amounts. Since these claims are based on the Loan Agreement, they must be assessed under Swiss law, in accordance with the choice of law clause contained in Article 5.1 of the Loan Agreement.

44.  In emergency relief proceedings, it is impossible to establish all facts and circumstances leading to the conclusion of the Loan Agreement. Based on the terms of the Loan Agreement and the evidence showing the payments made and the correspondence sent by SVM to Nexus, the Emergency Arbitrator nevertheless is satisfied that SVM has a *prima facie* entitlement for payment of the amounts claimed.

45.  Under the Loan Agreement, as amended on 16 May 2014, SVM as lender undertook to provide Nexus as borrower with a loan in the amount of USD 12,300,000 (Loan Agreement, Art. 1.1, Exh. C-3; Addendum, Art. 1, Exh. C-6). Nexus undertook to reimburse the loan, plus interest at 5% p.a., one year after receipt of the monies on its bank accounts (Loan Agreement, Art. 1.2 and 2.4, Exh. C-3; Addendum, Art. 2, Exh. C-6).

46.  Further, it was agreed that SVM shall be entitled to request an earlier reimbursement of the loan. In case a request for earlier reimbursement "*is sent to the Borrower in time exceeding 6 (six) months from the date of loan*", a reduced interest rate of 2,5 % shall be paid by Nexus for the use of the loan (Loan Agreement, Art. 2.7 *cum* Art. 2.4, Exh. C-3; Addendum, Art. 2, Exh. C-6).

47.     Finally, Nexus agreed to pay to SVM a penalty SVM at the rate of 0,05 % on the outstanding sum of the loan in case of untimely or incomplete payment of the main debt (Loan Agreement, Art. 3.1, Exh. C-3).

48.     There are no signs suggesting that the Loan Agreement is a sham transaction or otherwise invalid. In the light of the evidence, in particular the sequence of documents submitted as Exhibits C-3, C-6 and C-7 to C-8, it rather seems plausible, or at least not excluded, that the loan was intended to finance the purchase by Nexus of the two vessels Novorossiysk and Sevastopol, originally named SU-1 and SOY-1 and registered in Istanbul at the time (Exh. C-7 and C-8).

49.     SVM has adduced documentary evidence showing that a first tranche of USD 1,500,000 was paid to Nexus on 16 May 2014 and a second tranche of USD 10,800,000 on 30 May 2014 (Exh. C-9 and C-10).

50.     The evidence further shows that SVM made use of its contractual right to request an earlier reimbursement of the loan. By a registered letter dated 16 February 2015, SVM requested reimbursement of the entire loan, plus interest at 2,5 % by 27 February 2015 (Exh. C-14). Further payment requests were made by a registered letter dated 6 March 2015 (Exh. C-15) and by a notice dated 10 August 2015 intended to be served on Nexus by a court bailiff in Greece (Exh. C-17, Exh. C-20).

51.     In any event, the reimbursement of the entire loan seems to have become due for repayment one year after the money transfer to Nexus (para 45, above), meaning that the first tranche of USD 1,500,000 was to be repaid on 16 May 2015 and the second tranche of USD 10,800,000 was to be repaid on 30 May 2015.

52.     There is no evidence suggesting that Nexus and/or Mr Shumilin have reimbursed the loan wholly or in part. At first sight, it therefore seems credible that SVM has a claim for repayment of the loan, plus accrued interest and penalty. Upon a rough calculation, the amounts of interest and penalty claimed seem plausible.

Procedural Order No. 1 | Preliminary Order

---

b) Urgency | Risk of Frustration

53.     It results from the purpose of emergency relief proceedings that a Court-appointed emergency arbitrator may only grant interim measures that are truly urgent. The relevant test is whether the decision on the requested interim relief cannot await the constitution of an arbitral tribunal in accordance with Articles 7 and 8 of the Swiss Rules. This normally requires a particular urgency or risk that the required interim measure is frustrated if not immediately granted.

54.     The requirements for a Preliminary Order pursuant to Article 26(3) of the Swiss Rules are even more demanding, as such order may be issued only in "*exceptional circumstances*" (Article 26(3) of the Swiss Rules). The applicant must credibly show that the urgency or the potential risk of frustration is such that it is impossible or inappropriate to give the respondent an opportunity to be heard before the decision on the request is made. To sum up, such an order is justified only if a prompt and unannounced intervention is necessary to safeguard the applicant's alleged rights.

55.     According to SVM, it would suffer irreparable harm if the Respondents were notified of the arbitration or be granted an opportunity to be heard before the requested measures were granted. SVM purports that Nexus and/or Mr Shumilin would be able to, and would most certainly, transfer their assets before an award on provisional measures is made, even more so as such award would have to be enforced abroad, as neither Nexus nor Mr Shumilin seems to have assets in Switzerland. SVM in essence fears that it would end up with a claim against an empty shell company with no assets (Application, para 48).

56.     The Emergency Arbitrator is of the opinion that an abstract fear that a respondent might start hiding assets, when notified of the arbitration, would be insufficient to justify the granting of urgent interim relief by way of a preliminary order. Rather, the applicant must credibly show that, under the specific circumstances, there is an imminent risk that the respondent would transfer its assets beyond the reach of the applicant, if it were notified of the request for interim relief.

57.     In the present case, SVM has alleged a number of facts in support of its position that there is an imminent risk of ending up with an award against

an empty shell. For example, it is claimed that, in sharp contrast to various discussions held between SVM, Nexus and Mr Shumilin before the Loan Agreement was signed, Nexus and Mr Shumilin refused to sign an agreement prepared by SVM with a view to appointing a director for Nexus and obtaining 50% of its shares (Application, para 36-37); that Nexus renamed the purchased vessels shortly after receipt of the loan and moved their place of registration to the Republic of Palau, a small island country located in the Western Pacific Ocean, without informing SVM (Application, para 38); that Nexus did not reply to SVM's request for reimbursement of the loan (Application, para 40-44); and that, while preparing its NoA, SVM noticed that Nexus seems to have also an address in Russia (Application, para 52 *in fine*).

58. These alleged facts are at least in part credibly shown. Although there is no *prima facie* evidence showing that Nexus and/or Mr Shumilin, prior to the signing of the Loan Agreement, undertook to accept a representative of SVM as director of Nexus and to transfer 50% of the shares in Nexus to SVM, the Emergency Arbitrator is satisfied that an imminent risk of frustrating the purpose of the requested interim relief is *prima facie* given in the light of the other alleged circumstances, which are credibly shown, including the fact that neither Nexus nor Mr Shumilin seems to have reacted in any way to SVM's repeated requests for payment and that two out of three requests made by SVM could not be notified to Nexus (Exh. C-14 *cum* C-16; Exh. 17 *cum* C-20).

59. Therefore, the granting of interim measures, within the boundaries of the Emergency Arbitrator's jurisdiction, appears necessary and appropriate in the present case. The provision of an appropriate security can, if need be, be ordered upon request.

### 3. Necessity | Appropriateness of Measures Sought

60. An interim measures is an equitable remedy. Arbitrators will exercise their discretion to grant only such measures that they consider necessary or appropriate (see Article 26(1) of the Swiss Rules).

61. As demonstrated, it results from the Emergency Arbitrator's limited jurisdiction that only an order prohibiting Nexus from disposing of the assets (if

any) held on its accounts with Piraeus Bank (if any) up to the amounts claimed by SVM in the arbitration as well as an order prohibiting Nexus from disposing of the vessels Novorossiysk and Sevastopol could be issued (para 36-41).

62.    In light of the foregoing, the Emergency Arbitrator on a *prima facie* basis concludes that SVM has a legitimate interest in obtaining such interim relief and that such interest substantially outweighs the harm that Nexus is likely to suffer as a result of these measures. Indeed, Nexus would be free to withdraw the assets on its bank accounts to the extent that such assets exceed the amount concerned by this Order. Likewise, Nexus would be free to make use of its vessels Novorossiysk and Sevastopol as it sees fit, the only exception being that it may not dispose of these vessels.

63.    Since SVM has *prima facie* shown that the loan granted to Nexus was for the acquisition of the said vessels (para 48), there is a sufficient factual nexus between the claims raised in the arbitration and the object of the requested relief. The same is true for any bank account held by Nexus at Piraeus bank, as the loan was to be paid into a bank account held by Nexus with this bank (Exh. C-3, at p. 3).

64.    For these reasons, Prayers 4 and 5, as interpreted by the Emergency Arbitrator (see para 36, above) can be granted. In view of the total amount of the claims raised by SVM in the arbitration, i.e. USD 12,535,670.83, plus interest, the Emergency Arbitrator considers is appropriate to order Nexus to refrain from disposing of the assets (if any) held on its bank accounts (if any) at Piraeus Bank in Greece up to the amount of USD 12,880,000. In other words, Nexus is ordered to refrain from reducing the assets (if any) on its bank accounts (if any) at Piraeus Bank in Greece to an amount below USD 12,880,000.

65.    The Applicant has not specified its understanding of the verb 'dispose of'. By way of interpretation, taking into account the usual meaning of the verb as well as the intended purpose of the interim measures requested by the Applicant, the Emergency Arbitrator concludes that the wording 'dispose of' not only covers any transfer of ownership to a third party, but also other acts which materially affect the respondent's ownership rights and interests in respect of the assets in question, including, but not limited to,

the granting of a pledge or other security interests. The operative part of this Order will be formulated on the basis of this understanding.

66.    Likewise, Prayers 8 and 9 can be granted with the necessary precision.

## IX.    Costs

67.    The costs of this Order are not separately.determined. The determination of costs as referred to in Article 38(g) of the Swiss Rules will be made in the final decision on the Application, in accordance with Article 43(7) and (9) of the Swiss Rules.

## X.    Order

In the light of the foregoing, the Emergency Arbitrator, having duly considered SVM's request for a preliminary order, the evidence adduced and the applicable rules of law

### MAKES THE FOLLOWING ORDER:

1.    NEXUS MARITIME SERVICES GMBH is ordered not to dispose in any way (e.g. by a transfer of ownership, granting of a pledge or other security interests, or by any other act materially affecting its ownership rights and interests) of the assets (if any) held on its bank account at Piraeus Bank in Greece with the IBAN GR 06 0171 5520 0065 5210 8772 012 up to the amount of USD 12,880,000.-.

2.    NEXUS MARITIME SERVICES GMBH is ordered not to dispose in any way (e.g. by a transfer of ownership, granting of a pledge or other security interests, or by any other act materially affecting its ownership rights and interests) of the assets (if any) on any other bank account (if any) held with Piraeus Bank in Greece up to the amount of USD 12,880,000.-.

PROCEDURAL ORDER No. 1 | PRELIMINARY ORDER

3.  NEXUS MARITIME SERVICES GMBH is ordered not to dispose in any way (e.g. by a transfer of ownership, granting of a pledge or other security interests, or by any other act materially affecting its ownership rights and interests) of the vessel currently named "Novorossiysk", built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160.

4.  NEXUS MARITIME SERVICES GMBH is ordered not to dispose in any way (e.g. by a transfer of ownership, granting of a pledge or other security interests, or by any other act materially affecting its ownership rights and interests) of the vessel currently named "Sevastopol", built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184.

5.  All other or further Prayers of the application for *ex parte* emergency relief (Prayer B) are dismissed.

6.  A copy of the file, including the Application for Emergency Relief together with its Exhibits, is notified to the Respondents together with this Order.

7.  A telephone conference is set at ~~Friday 21~~ Tuesday 25 August 2015 at **11:00 CEST** to *(i)* grant the Respondents an immediate opportunity to be heard orally, if they so wish, and to *(ii)* consult the Parties on the timetable and specific procedural rules for these proceedings on the basis of the drafts provided to the Parties together with this Order. 19.8.2015 DA.

8.  This Order is notified to the Parties (by registered letter or DHL, respectively) and to the Secretariat of the Arbitration Court (by email). One original remains with the Sole Arbitrator.

Made in four originals

THE EMERGENCY ARBITRATOR:

Dr Diana Akikol
Geneva, Switzerland (seat of the emergency arbitration)
19 August 2015



## Khrenov & Partners

| Law Office |

3 B. Vatin lane, Moscow, Russia, 109240
phone: +7 (495) 927-0707  fax: +7 (495) 927-0907
www.yklaw.ru info@yklaw.ru

August 20, 2015

**Anticipated by email (info@palaushipregistry.com)**

Palau International Ship Registry
Head Office
16701 Greenspoint Park Drive, Suite 155
Houston, TX, 77060
United States

**Nexus Maritime Services GmbH (IMO Company Number 5116273)**
**Emergency interim relief measures in respect of the vessels "Novorossiysk" (IMO**
**Ship Number 7822160) and "Sevastopol" (IMO Ship Number 7822184)**

Dear Sir,

     We are acting as the legal counsel of SVM Holdings S.A. **("SVM")** in the matter of the dispute between SVM and Nexus Maritime Services GmbH **("Nexus")**, owner of the vessels "Novorossiysk" (IMO Ship Number 7822160) and "Sevastopol" (IMO Ship Number 7822184), navigating under the Palau flag.

     We hereby inform you that a Preliminary Order was rendered on August 19, 2015 in the proceedings No. 300347ER-2015 by an Emergency Arbitrator appointed by the Swiss Chambers' Arbitration Institution, who is competent to judge the dispute between SVM and Nexus.

<u>**The Emergency Arbitrator made, among others, the following orders:**</u>

—  "**Nexus Maritime Services GmbH is ordered not to dispose in any way** (e.g. by a transfer of ownership, granting of a pledge or other security interests, or by any other act materially affecting its ownership rights and interests) **of the vessel currently named "Novorossiysk" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822160.**"

—  "**Nexus Maritime Services GmbG is ordered not to dispose in any way** (e.g. by a transfer of ownership, granting of a pledge or other security interests, or by any other act materially affecting its ownership rights and interests) **of the vessel currently named "Sevastopol" built in 1980 and navigating under the Palau flag, IMO Ship Number 7822184.**"



**EXHIBIT**

11

Copies of the relevant pages of the Preliminary Order dated August 19, 2015 are attached for your reference below.

Please note that the Preliminary Order is in the process of being enforced with the local courts. Local legal counsel has been appointed and it will be in contact with you shortly.

**The purpose of this letter is to inform you of the exceptional seriousness of the situation and request you to fully comply with the Preliminary Order.** Our client may hold you responsible of any loss suffered as a consequence of your not complying and/or assisting Nexus in not complying with the Preliminary Order dated August 19, 2015.

Due to the importance of this letter, we would be grateful if you could acknowledge receipt of it and confirm that you have taken good note of the above.

Please note that this letter and its enclosure are **highly confidential**.

I naturally stay at your disposal should you have any question.

Yours sincerely,

Alexander Konkov, Esq.
Email: a.konkov@yklaw.ru
Mob.: +(7) (916) 990-4646

**Enclosure:**
1. International Tonnage Certificates for the vessels "Novorossiysk" (IMO Ship Number 7822160) and "Sevastopol" (IMO Ship Number 7822184).
2. Excerpts from the Preliminary Order dated August 19, 2015.